Luz María Marrero Reyes, demandante y apelada, *v.* Héctor García Ramírez y Otros, demandados y apelantes.

Número: O-76-60        Resuelto: 9 de septiembre de 1976

*Raúl Aponte Sánchez,* abogado de los apelantes; *Luis F. Abreu Elías,* abogado de la apelada.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

La madre de una niña nacida en marzo de 1963 instó recurso de hábeas corpus ante el Tribunal Superior contra los abuelos maternos [1] y el padre de la menor para recobrar su custodia. La menor es la tercera de cinco hijos habidos en el primer matrimonio de la demandante apelada.

Los abuelos han criado a la menor desde que ésta contaba año y medio de edad, cuando la niña contrajo tuberculosis no pulmonar y se le envió a casa de ellos. Los abuelos se trasladaron de San Juan a Santa Cruz, Islas Vírgenes, varios meses después, ya recuperada la niña. Los abuelos y la niña han residido ininterrumpidamente en Santa Cruz desde entonces.

Unos años más tarde, en 1968, los padres de la menor se divorciaron. Por estipulación de las partes en dicho pleito, dos hijos quedaron bajo la custodia de la madre, quien especificó que se trasladaría de Puerto Rico a España para continuar sus estudios en medicina; el esposo, aquí codemandado, domiciliado en Puerto Rico, retuvo la custodia provisional de otros dos; y la custodia provisional de la menor objeto de la actual controversia se confió a la abuela materna, "con domicilio establecido en Santa Cruz, Islas Vírgenes", según se expresó en el decreto del tribunal puertorriqueño que entendió en el asunto.

La madre regresó a Puerto Rico en abril de 1972. Poco más tarde, su ex-esposo le hizo entrega a ella de los dos hijos confiados a su custodia. El 20 de junio de 1975, luego de

---

[1] Estos eran tíos biológicos y padres adoptivos de la madre apelada.

gestiones informales infructuosas, la madre instó un recurso de hábeas corpus ante el Tribunal Superior de Puerto Rico para que los abuelos le devolviesen la custodia de su hija.

El informe de la trabajadora social revela que la menor prefiere vivir con sus abuelos; que considera a su madre, padrastro y hermanos más bien como amigos; que le gusta venir a Puerto Rico de paseo por unos días, pero no a quedarse definitivamente. La trabajadora social estima que de extraerse a la niña del hogar que considera suyo desde la infancia no le sería fácil la adaptación ya que no se siente parte de la familia. La madre admite que los abuelos quieren mucho a su hija, que la tratan bien y que le proveen todo lo que ella necesita en el aspecto material, mas le preocupa que la niña piense que ella la abandonó y que no luchó por su custodia. Del informe de la trabajadora social se desprende que las condiciones del hogar e ingresos del hogar materno son también enteramente adecuados.

Los abuelos impugnaron desde el comienzo de este pleito la jurisdicción del los tribunales de Puerto Rico para entender en este asunto por razón de que su domicilio radica en Santa Cruz. El Tribunal Superior se declaró con jurisdicción y resolvió que la custodia de la menor le corresponde a la madre. Dispuso, no obstante, que la entrega permanente debía ocurrir después de un período de readaptación de cinco meses, en que la menor viniese a Puerto Rico en fines de semanas alternos. De esta sentencia es que se recurre por la abuela.

Hay cuatro problemas centrales, entre otros de orden subsidiario, (²) que estos hechos plantean: 1) ¿Tienen jurisdicción los tribunales de Puerto Rico para resolver este caso? 2) Aun de tener jurisdicción, ¿debe ésta ejercerse? 3) De existir jurisdicción y de no haber razón para rehusar su ejerci-

---

(²) Otra cuestión, por ejemplo, suscitada por la parte es la alegada improcedencia del recurso de hábeas corpus en casos de guarda de menores. No le asiste razón. *Pratt* v. *Reuter*, 79 D.P.R. 962 (1957); *Chabert* v. *Sánchez*, 29 D.P.R. 241 (1921); *Babá* v. *Rodríguez*, 36 D.P.R. 502 (1927).

cio, ¿cuál es la ley aplicable, la de Puerto Rico o la de las Islas Vírgenes? 4) De aplicarse la ley puertorriqueña, ¿qué reglas deben regir la concesión de la custodia en este litigio?

# I

*La cuestión jurisdiccional.*

Se han propuesto muchas teorías sobre las normas jurisdiccionales que deben regir estos casos. El pensamiento sobre el particular se distingue, excepto en algunas expresiones recientes, por la búsqueda de un principio básico que mágicamente resuelva de modo uniforme la extraordinaria variedad de circunstancias que entrañan las disputas sobre guarda de menores. El objetivo es intachable. La certeza en las relaciones humanas representa sin duda un alto valor. Desde hace algún tiempo va creciendo la sospecha, no obstante, que la persecución de ese valor puede resultar en perjuicio de intereses más altos; que lo que se ha intentado hacer con intención tan noble monta en gran medida tan solo a querer darle caza al unicornio.

Repasemos las teorías principales. La antigua boga de la teoría del domicilio del menor, tan ardientemente defendida por Beale y adoptada en la primera reformulación del derecho norteamericano—2 Beale, *Conflict of Laws*, 717; Rest. *Conflicts* (1°), secs. 117, 148—ilustra la dificultad a que nos referimos. Como base única o aun primordial para resolver el problema de jurisdicción es enteramente inaceptable. Rest. *Conflicts* (2°), sec. 99; Ehrenzweig, *A Treatise on the Conflict of Laws* 281 (1962). Según expresamos en *Pratt* v. *Reuter*, 79 D.P.R. 972–973 (1957), "Puede decirse que en la actualidad, la doctrina y la jurisprudencia se niegan a aceptar que el domicilio del menor es la única base de jurisdicción sobre su persona."

Otra teoría sostiene que la jurisdicción debe basarse estrictamente en la existencia de jurisdicción *in personam* sobre los litigantes o sobre el niño. También se rechaza hoy general-

mente la jurisdicción *in personam* como base exclusiva para determinar la facultad del foro para fallos sobre la guarda de menores. Stumberg, *The Status of Children in the Conflict of Laws*, 8 U. Chi. L. Rev. 42, 54–55 (1940).

Otra tesis propugna que el foro apropiado es el sitio donde habitualmente resida el menor. *Kenner* v. *Kenner*, 201 S.W. 779 (Tenn. 1917); *Shechey* v. *Shechey*, 186 A.2d 1 (N.H. 1936). Tampoco se le reconoce hoy como fundamento jurisdiccional exclusivo. Clark, *The Law of Domestic Relations in the United States*, 1968, pág. 321.

En varios países civilistas se le da especial énfasis a la nacionalidad del niño. Silving, *Nationality in Comparative Law*, 5 Am. J. Comp. L. 410 (1956); 1 Rabel, *The Conflict of Laws—A Comparative Study*, 2ª ed. 1958, 109 y ss.; Nussbaum, *Rise and Decline of the Law of Nations Doctrine in the Conflict of Laws*, 42 Col. L. Rev. 189 (1942). Leflar estima que en Estados Unidos se le debe dar peso también, y que de hecho se le da, a este factor. Leflar, *American Conflicts Law*, ed. rev., 1968, págs. 46–47. Existe, no obstante, fuerte base para sostener que la nacionalidad per se no confiere jurisdicción sobre la persona, Verplaetse, *Derecho Internacional Privado*, Madrid, 1954, pág. 630 y ss. Cheshire, *Private International Law*, 7ª ed., 1965, Londres, pág. 555, pero debemos detenernos un tanto a considerar la teoría de la nacionalidad, en vista de su importancia para aclarar el rol del Art. 9 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 9, [3] en este género de controversias.

En España y Alemania, por ejemplo, la nacionalidad juega un papel distinto que el que le asignan algunos otros países donde rige el derecho civil. En Alemania se distingue claramente entre el problema de la existencia o no de jurisdicción y la cuestión conflictual sustantiva de definir la ley

---

[3] El Art. 9 dispone: "Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal de las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros."

aplicable. B.G.B. sec. 1635; 1 Rabel, *op. cit.* 574. Igual sucede en España, donde generalmente se estima que el derecho procesal internacional no pertenece *strictu sensu* al derecho internacional privado. Verplaetse, *op. cit.* 631, 638, 639, 676. Para que exista jurisdicción sobre la persona es usualmente necesario que se den los requisitos del Art. 51 de la Ley de Enjuiciamiento Civil, Guasp, *Comentarios a la Ley de Enjuiciamiento Civil*, tomo 1, 2ª ed. 1948, Madrid, págs. 280–285, si bien la situación no es enteramente clara en cuestiones de custodia. La nacionalidad, sin embargo, no se considera en varios países civilistas el factor exclusivo o aun ni siquiera el decisivo en materia de guarda legal. 1 Rabel, *op. cit.* 574 y ss.

Las dificultades que a veces se denotan en el uso de la nacionalidad de otros criterios como base de jurisdicción se aminoran o disuelven si nos cuidamos de separar escrupulosamente el problema de la existencia de jurisdicción de la cuestión de si debe ejercerse ésta en determinado caso. En este sentido no es imprescindible despojar la nacionalidad o la ciudadanía de todo peso al considerar el problema de la existencia de jurisdicción. Estimamos que tiene cierto valor como norma conflictual procesal, como un factor no exclusivo para el análisis de la cuestión jurisdiccional. Del otro lado, las inconveniencias que pueden resultar fácilmente de su uso, así como del uso de otros factores antes discutidos, pueden mitigarse mediante el establecimiento de reglas que fomenten el ejercicio mesurado y sabio de la jurisdicción de que se disfrute. Más adelante nos referiremos a ciertas interrogantes particulares que plantea el texto del Art. 9 de nuestro Código Civil.

En las últimas décadas, ante esta proliferación de enfoques a través de largos años, han estado ocurriendo diversos desarrollos de interés. En primer término, se ha reconocido que no existe un fundamento jurisdiccional único, aunque se han dado esfuerzos para lograr un consenso al efecto. La tarea actual se concentra en intentar enumerar distintas bases en

que se pueda asentar la jurisdicción separadamente y en luchar porque se logre la máxima prudencia en el ejercicio de la jurisdicción de que se disfrute. En segundo lugar, la jurisprudencia y la doctrina se han estado reconciliando crecientemente al hecho, consecuencia inevitable de lo anterior, que en muchos casos de custodia ocurre que varios tribunales poseen jurisdicción concurrente. Esto de nuevo realza la importancia de ir creando normas que regulen el ejercicio de la jurisdicción. En último término, se han estado revalorizando los intereses que respaldan varias de las teorías discutidas con la consecuencia de que se postula hoy como interés máximo un interés distinto al que antes animaba éste y otros problemas de guarda de menores. Este último desarrollo ha motivado la creación de una nueva doctrina que ha llevado a la ampliación de las posibles bases jurisdiccionales.

La nueva doctrina se remonta de hecho a más de tres décadas. Stumberg la formuló vigorosamente en un artículo que tuvo honda repercusión en la doctrina y jurisprudencia norteamericana. Stumberg, *The Status of Children in the Conflict of Laws*, 8 U. Chi. L. Rev. 42 (1940). Stumberg distinguía, como deben distinguirse, los casos de custodia de los referentes a asuntos estrictamente de divorcio, filiación y adopción. Los asuntos de guarda de menores representaban para él una categoría *sui generis*. A su juicio, al resolver estos casos, incluso el problema jurisdiccional, "el juzgador no se debe guiar tanto por fórmulas legalistas como por consideraciones que atañan esencialmente los intereses del menor." (A la pág. 55.) Stansbury expande la tesis y postula expresamente el principio de que "un tribunal de cualquier estado que posea un interés sustancial en el bienestar del niño o en la preservación de la unidad familiar de que forma parte tiene jurisdicción para determinar su custodia, y esta jurisdicción puede existir en dos o más estados al mismo tiempo." Stansbury, *Custody and Maintenance Law Across State Lines*, 10 Law & Contem. Prob. 818, 831–832 (1944). Stansbury

influye en la posición del juez Traynor en *Sampsell* v. *Superior Court*, 197 P.2d 739 (Cal. 1948), decisión que tuvo gran impacto en otros tribunales y comentaristas, ([4]) Currie, *Selected Essays on the Conflict of Laws*, Duke Univ. Press., 1963, pág. 675 y ss.

La influencia directa de *Sampsell* en la segunda reformulación del derecho norteamericano se acepta expresamente por sus autores. Rest. *Conflict* (2°), sec. 79, pág. 240. El principio enunciado por Stansbury se reduce considerablemente, no obstante, en esta segunda reformulación, ya que tan solo se reconoce la existencia de jurisdicción para determinar la custodia de un menor cuando éste tenga su domicilio en el estado donde se instiga el pleito; o cuando el menor esté físicamente presente en dicho estado; o cuando, de no darse las condiciones anteriores, la controversia es entre dos o más personas que están individualmente sujetas a la jurisdicción del estado. *Loc. cit.*

En la introducción a la Ley Uniforme sobre Custodia de Menores, West, 1973, 9 U.L.A. 99 y ss., ([5]) se señala que "La tendencia judicial es permitir los litigios sobre custodia en casi cualquier estado, no importa lo pasajero del contacto entre el foro escogido y el menor y su familia, sin que se preste gran atención a normas conflictuales específicas." (A la pág. 100.) Véanse también: Leflar, *American Conflicts Law*, 1968, págs. 585–586 y Leflar, 1967 *Annual Survey of American Law*, *Conflict of Laws* 26 (1968). La Ley Uniforme intenta imprimirle debido orden a esta tendencia para que no se desemboque en una discreción ilimitada. Al mismo fin se dirige la segunda parte de esta opinión, aunque por camino distinto, pero más amplio, de modo que pueda atenderse un mayor número de situaciones en campo de tal complejidad.

---

([4]) Cardozo la había anticipado parcialmente en *Finlay* v. *Finlay*, 148 N.E. 624 (N.Y. 1925).

([5]) Esta Ley Uniforme se ha adoptado hasta ahora en siete estados.

Respecto a cambios sufridos en otros países, véanse: Castro-Rial Canosa, *El Convenio de la Haya sobre Protección de Menores*, 14 Rev. Esp. de Derecho Internacional 11 (1961); Castán, *Derecho Civil Español, Común y Foral*, tomo 5, vol. 1, 8ª ed. rev., 1960, Madrid, 702 y ss. y Puig Brutau, *Fundamentos de Derecho Civil*, tomo 4, vol. 1, 1967, Barcelona, 194 y ss.

Diversos tribunales y autores han ido aún más lejos que la segunda reformulación del derecho norteamericano, admitiendo como base jurisdiccional el hecho de que un solo litigante y no necesariamente todos tengan su domicilio en el estado. Clark, *The Law of Domestic Relations in the United States*, 1968, págs. 319, 321.

■ Opinamos, a la luz de las consideraciones anteriores, que el interés primario que debe gobernar el análisis de variadas facetas de estos casos exige que se adopte la regla más abarcadora posible sobre el aspecto jurisdiccional, sujeto a las salvaguardas que se formulan en la segunda parte de esta opinión. Resolvemos a tal efecto que los tribunales de Puerto Rico tienen jurisdicción para entender en casos de custodia en cualquiera de las situaciones siguientes: 1) cuando se posee jurisdicción *in personam* sobre todos los litigantes o aun sobre una sola de las partes; 2) cuando el menor está domiciliado en Puerto Rico; 3) cuando el menor está físicamente presente o tiene su residencia habitual en Puerto Rico; y 4) cuando el menor es ciudadano o nacional de Puerto Rico. Resolvemos, además, que el hecho de que exista jurisdicción para juzgar un asunto de guarda de menores no justifica de por sí su ejercicio, a menos que las normas que se expresan en la segunda parte de esta opinión revelen que Puerto Rico constituye un foro apropiado a tales fines en las circunstancias específicas de que se trate.

De lo anterior se desprende que existe base jurisdiccional adecuada para resolver este caso en Puerto Rico. Hay jurisdicción *in personam* al menos sobre la parte recurrida y, bajo

la regla de *Medina* v. *Tribunal Superior*, 104 D.P.R. 346 (1975), aun sobre todas las partes litigantes, si es que se atiende al hecho que el decreto original de custodia se dictó por el propio Tribunal Superior de Puerto Rico. Dada la existencia de este fundamento jurisdiccional, es innecesario resolver dónde radica el domicilio de la menor, así como el asunto de si es ciudadana o nacional de Puerto Rico.

## II

*El ejercicio de la jurisdicción.*

■ Los tribunales debemos sopesar diversos factores para determinar si, aun gozando de jurisdicción, debemos abstenernos de ejercerla. Entre ellos debemos enumerar los siguientes: la suficiencia de la información disponible para aquilatar debidamente los hechos y formar juicio sobre el impacto del decreto que se dicte sobre la personalidad y el bienestar del menor; la sustancialidad de los contactos del foro con la controversia; el grado a que el ejercicio de jurisdicción pueda desalentar la multiplicación y prolongación de controversias sobre el asunto y contribuir a crear la estabilidad necesaria; el punto a que se tienda, como se debe tender, a evitar el secuestro unilateral de menores para fines de obtener un decreto de custodia; y el extremo en que se facilite el mayor respeto posible a las determinaciones de otros estados, así como del propio foro.

El proceso es delicado. Entre los objetivos que deben perseguirse principalmente se cuentan el logro de la mayor uniformidad posible y el desarrollo de la máxima deferencia a las determinaciones de otros países y estados. Sobre toda otra consideración reina, no obstante, el interés en la salud afectiva, el buen cuido y el bienestar general del menor. De ahí que es enteramente posible que ciertos factores inviten a invocar la doctrina de *forum non conveniens*, pero que el peso de otros aconsejen el ejercicio de jurisdicción.

En ciertos casos el análisis puede resultar muy sencillo. Si la única base de la jurisdicción, por ejemplo, es la regla de *Medina*, o la sumisión al foro de uno solo de los litigantes, pero se carece de datos adecuados o confiables para conceder o denegar la custodia; y el menor no está presente; y todos los litigantes tienen su domicilio fuera de Puerto Rico; y no hay otros contactos con el foro que los expresados; y todo indica que emitir juicio sobre la custodia difícilmente vaya a estabilizar la situación de modo verdaderamente duradero, la posición más prudente del tribunal es abstenerse de ejercer su jurisdicción. Igual sucede bajo circunstancias parecidas si el único hilo que atase los tribunales puertorriqueños al caso fuese la ciudadanía o nacionalidad del menor.

Consideramos que en el caso actual la balanza decididamente se inclina a favor del ejercicio de jurisdicción. Si bien es cierto que los abuelos y la niña viven en Islas Vírgenes, se cuenta con amplia información sobre las condiciones que reúnen ambos hogares y la actitud de la menor. Se entrevistó a la niña en Puerto Rico, se conocen sus sentimientos sobre el problema y se visitó el hogar de la madre. No pudo la trabajadora social trasladarse a Santa Cruz, pero la madre admite que la niña recibe cariño y buen cuido por parte de los abuelos, a pesar de que el abuelo es inválido y la madre considera que la abuela es "seca, autoritaria y dominante." La prolongación de esta controversia, que de por sí tiene que ser perturbadora para una niña en la crítica edad de trece años, es también altamente indeseable, prolongación que inevitablemente ocurriría si tienen que iniciarse nuevos procedimientos en las Islas Vírgenes. El bienestar de la menor exige que se intente resolver esta situación prontamente y del modo menos traumático posible. De lograrse esto último—lo cual está necesariamente vinculado en cierta medida, como cuestión de realidad, a la que finalmente se disponga sobre la custodia—las probabilidades son altas de que el sistema judicial de las Islas Vírgenes rehúse ejercer la jurisdicción concurrente que clara-

mente tiene sobre este asunto. ([6]) Adviértase, por último, la variedad de contactos que Puerto Rico tiene con este problema de cutodia: los padres de la niña—sin que tengamos que referirnos a la condición de los abuelos y la niña—son puertorriqueños; la demandante recurrida y el padre codemandado residen aquí; también los hermanos de la niña; la madre tiene su hogar en Puerto Rico, hogar que de no declararse ahora el hogar principal de la menor es de todos modos un hogar que a ella le gusta visitar y que, de faltarle los abuelos en edad temprana, se convertiría entonces en su único hogar. En las circunstancias señaladas, no se vulnera la deferencia debida a los tribunales de otra jurisdicción al entenderse en el fondo del caso.

## III

*La ley aplicable.*

El Art. 9 de nuestro Código Civil, 31 L.P.R.A. sec. 9, citado anteriormente, deriva del Art. 9 del Código Civil Español. ([7]) Mientras que el Art. 9 del Código Civil Español disponía, no obstante, que "Las leyes relativas a los derechos y deberes de la familia, o al estado, condición y capacidad legal de las personas, obligan a los españoles, aunque residan en país extranjero.", nuestro código se limitó desde 1902 a expresar que tales leyes obligaban "a los ciudadanos de Puerto Rico." Tal parece que la Asamblea Legislativa consideró prudente o jurídicamente inevitable soslayar el uso de términos que pudiesen dar base a argumentar la existencia de

---

([6]) La cláusula de entera fe y crédito no juega un rol de importancia en estos casos. *Kovacs* v. *Brewer*, 356 U.S. 604 (1958); *New York ex rel. Halvey* v. *Halvey*, 330 U.S. 610 (1947); *Bergen* v. *Bergen*, 8 V.I. 336, 439 F.2d 1008 (3d Cir. 1971); *In the Matter of Hutchins*, 8 V.I. 181 (1971); *Perrin* v. *Perrin*, 7 V.I. 21 (3d Cir. 1969); *De Pinto* v. *Pinto*, 6 V.I. 179 (D.V.I. 1976); Bodenheimer, *The Uniform Child Custody Jurisdiction Act: a Legislative Remedy for Children Caught in the Conflict of Laws*, 22 Vand. L. Rev. 1207 (1969).

([7]) Este artículo sufre enmiendas en virtud de la Ley de Bases de 17 de marzo de 1973 que no cabe discutir aquí. Para una discusión de estas enmiendas, véase: 1 Castán, *op. cit.*, 11ª ed., 1975, pág. 631 y ss.

una nacionalidad puertorriqueña como tal. A tal efecto se suprimieron de nuestro Código Civil, contrario a las recomendaciones de la Comisión Codificadora de 1902, (⁸) los Arts. 17(a), 18 y 20 del antiguo Código Civil Español, (⁹) que establecen, entre otros, el principio de que es español todo aquél que sea hijo de padre o madre españoles, aunque nacieren fuera de España y que tal condición subsiste hasta tanto se renuncie la nacionalidad o se le despoje de ella bajo las disposiciones de los Arts. 22 y 23. En su lugar se insertó un artículo, el número 10 del Código Político de 1902, 1 L.P.R.A. sec. 7, disponiendo que "Son ciudadanos de Puerto Rico: 1. Toda persona nacida en Puerto Rico y sujeta a su jurisdicción. 2. Toda persona nacida fuera de Puerto Rico que sea ciudadano de los Estados Unidos y resida dentro del territorio. 3. . . ." A tono con las corrientes político-constitucionales que afectaban el clima de aquellos viejos tiempos, se estaba intentando claramente sustituir el concepto de la nacionalidad por la ciudadanía al modo territorial norteamericano.

La fundación del Estado Libre Asociado de Puerto Rico en 1952 plantea serios problemas constitucionales. ¿Subsisten los conceptos que determinaron la acción de la Asamblea Legislativa en 1902, en contra de las recomendaciones de la propia Comisión Codificadora y aun antes de que se decidiese el núcleo de los Casos Insulares, o existe base jurídica hoy para reclamar, sin que se vulneren los vínculos de la asociación creada, como tampoco sus términos, la existencia de una nacionalidad puertorriqueña que le haya impartido nuevo con-

---

(⁸) En el Art. 25 del proyecto de Código Civil de esta Comisión se disponía que eran ciudadanos de Puerto Rico los nacidos aquí o los hijos de padres ciudadanos de Puerto Rico. No se exigía de éstos que estuviesen sujetos a la jurisdicción. *Informe de la Comisión Codificadora de Puerto Rico,* tomo 1, San Juan, 1902.

(⁹) Los Arts. 17 al 27 del Código Civil Español se revisan el 15 de julio de 1954, pero se mantienen normas básicamente similares a las antes vigentes. Manresa, *Comentarios al Código Civil Español,* tomo 1, 7ª ed. rev., 1956, págs. 294–316 y 335–338.

tenido al Art. 9 o haya establecido una nueva base para la determinación de la ley aplicable en este género de casos?

■■ No es necesario que formulemos juicio sobre estas complicadas cuestiones, sin embargo, pues la ley aplicable a este caso es identificable en forma menos ardua. En el pleito actual se ha objetado la jurisdicción de los tribunales de Puerto Rico, pero en momento alguno se ha argumentado que la ley aplicable es la de las Islas Vírgenes ni se ha desfilado prueba sobre la naturaleza de dicha ley. En tales circunstancias debe presumirse que la ley extranjera es idéntica a la local. *Esteves* v. *Registrador*, 43 D.P.R. 7, 9 (1932). Véase la opinión concurrente de 30 de enero de 1976 en *Futurama Import Corp.* v. *Trans Caribbean*, 104 D.P.R. 609 (1976). Aun cuando adoptemos el criterio de que no es necesario traer prueba de la ley extranjera, encontramos que la ley de Islas Vírgenes es igual a la nuestra. *In the Matter of Hutchins*, 8 V.I. 181 (1971).

## IV

*Determinación de la custodia.*

■■ Es doctrina sentada en Puerto Rico que las determinaciones sobre custodia deben guiarse principalmente por el bienestar y los mejores intereses del menor. *Rodríguez* v. *Gerena*, 75 D.P.R. 900 (1954); *Castro* v. *Meléndez*, 82 D.P.R. 573 (1961). Véanse también las Leyes Núm. 99 y 100 de 1976. Varios comentaristas y tribunales estadounidenses y españoles han adoptado también esta posición de avanzada. Clark, *The Law of Domestic Relations in the United States*, 1968, pág. 591 y ss.; *Giacopelli* v. *Florence Crittenton Home*, 158 N.E.2d 613 (Ill. 1959); *People ex rel. Edwards* v. *Livingston*, 247 N.E.2d 417 (Ill. 1969); Notes and Comments— *The Rights of Foster Parents to the Children in Their Care*, 50 Chi.-Kent L. Rev. 86 (1973); Puig Brutau, *Fundamentos de Derecho Civil*, tomo 4, vol. 1, 1967, Barcelona, pág. 194 y ss.; Sentencia de 26 de enero de 1974, 41 *Repertorio de*

*Jurisprudencia*, ed. Aranzadi, Núm. 261, pág. 190; Castán, *Derecho Civil Español, Común y Foral*, tomo 5, vol. 1, 8ª ed. rev. 1960, Madrid, pág. 702 y ss. Nuestra jurisprudencia no acepta la regla mecánica de que los padres biológicos deben prevalecer siempre. *N.N.N.* v. *N.N.N.*, 95 D.P.R. 291 (1967); *Chabert* v. *Sánchez*, 29 D.P.R. 241 (1921). Al mismo efecto: *State ex rel. Nelson* v. *Whaley*, 75 N.W.2d 786 (Minn. 1956). Ni siquiera se suscribe en este foro la doctrina de Mississippi y otros pocos estados al efecto de establecer una presunción a favor de los padres biológicos que tenga que refutarse por los padres psicológicos. Note, *Child Custody—Rebutting the Presumption of Parental Preference*, 43 Miss. L.J. 247 (1972). Tampoco gobierna el campo de la guarda de menores el concepto de la patria potestad. *Rodríguez* v. *Torres*, 80 D.P.R. 778, 780 (1958). La consideración preeminente en Puerto Rico es promover el máximo bienestar del menor, aunque es natural que se le asigne considerable valor al vínculo biológico al evaluar los diversos factores que deben analizarse en estos casos.

■ Para determinar qué tipo de decreto puede redundar en el mejor interés del menor deben examinarse, entre otros, los siguientes factores: la preferencia del menor, su sexo, edad y salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud psíquica de todas las partes. Oster, *Custody Proceedings: a Study of Vague and Indefinite Standards*, 5 J. Fam. L. 21, 22 (1965); Clark, *op. cit.*, 591 y ss.; Taylor, *Child Custody Problems in Illinois*, 521, 522, n. 3 (1975); Calloso, *Custody of the Child and the Uniform Marriage and Divorce Act*, 18 S. Dak. L. Rev. 551 (1973). Véanse: *Bermúdez* v. *Tribunal Superior*, 97 D.P.R. 825 (1969); *Castro* v.

*Meléndez*, 82 D.P.R. 573 (1961); *Rodríguez* v. *Torres*, 80 D.P.R. 778 (1958). Ningún factor es de por sí decisivo. Hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y al menos aproximarse al logro de la solución más justa en asunto de tan extrema dificultad.

En el caso presente se trata por fortuna de dos excelentes hogares y de partes capacitadas y maduras, que quieren hondamente a la menor y que por todo ello es de esperarse que puedan unir su inteligencia y esfuerzo para librar a la niña a la brevedad posible de la ansiedad y zozobra que usualmente generan estos litigios. Las condiciones morales y económicas de ambos hogares son también óptimas. La menor ha expresado, no obstante, que prefiere continuar residiendo habitualmente en las Islas Vírgenes, aunque disfruta sus visitas al hogar de la madre. Sus nexos familiares, escolares y comunales psicológicamente más estrechos son con las Islas Vírgenes. A los trece años, cuenta con edad suficiente para formar juicio confiable sobre sus preferencias. Las necesidades afectivas de la menor requieren reconocidamente a su edad la mayor estabilidad ambiental posible en su desarrollo. Estudios psiquiátricos y jurídicos recientes recalcan la importancia, para el desarrollo psicológico adecuado de la menor, de que se mantenga en lo posible su relación con el adulto que la ha cuidado y que ha satisfecho sus requerimientos emocionales. Goldstein, Freud, Solnit, *Beyond the Best Interest of the Child*, 1973; Note, *Increasing the Rights of Foster Parents*, 36 Pitts. L. Rev. 715 (1975); *Alternatives to "Parented Right" in Child Custody Disputes Involving Third Parties*, 73 Yale L.J. 151 (1963). Para una amplia discusión de este principio, véase también la opinión disidente en *Rosell* v. *Meléndez*, 101 D.P.R. 329, 330–356 (1973). Para que ocurra un cambio vital en dicha relación debe haber sucedido un cambio suficiente en la calidad del cuido que se haya estado recibiendo o la existencia de otro riesgo análogo para el menor. *Colón* v. *Meléndez*, 87 D.P.R. 442 (1963); *N.N.N.* v. *N.N.N.*,

95 D.P.R. 291 (1976); Taylor, *Child Custody Problems in Illinois*, 24 De Paul L. Rev. 521, 527–528 (1974). Es posible, además, en este caso, formular un decreto que, sin sacrificar el interés de la menor, propenda también al bienestar de los adultos en controversia.

■ Antes de formularlo, no obstante, debe reafirmarse el estado de ley en Puerto Rico respecto al argumento de que la mayor edad o la edad avanzada de quien cuide de un menor debe mover siempre a decidir por fuerza a favor del reclamante biológico. En *N.N.N.* v. *N.N.N.*, supra, rehusamos despojar a la abuela materna, a quien le restaban diez años de vida según el tribunal de instancia, de la custodia de un menor de cuatro años a quien había criado desde que nació.

El análisis que precede revela que lo más prudente en este caso es mantener básicamente inalterada la concesión de custodia que se hizo originalmente en 1968 como parte del divorcio de los padres. La abuela retendrá la custodia, mas, del otro lado, en debida armonización de los intereses envueltos, la madre tendrá derecho a que su hija visite su hogar un fin de semana al mes y la mitad de todas las vacaciones escolares de que disfrute la niña. La distribución de dichas mitades durante el primer año a partir de esta sentencia la efectuará la abuela si es que no se hace, como debe hacerse, de mutuo acuerdo, correspondiéndole el segundo a la madre y así sucesivamente. La madre y su familia tendrán derecho, además, a visitar a la menor en Islas Vírgenes cuantas veces deseen. Las partes podrán por mutuo acuerdo alterar las fechas y duración de estas visitas.

El tribunal, por último, exhorta a las partes a cooperar continuamente entre sí para que la menor, en vez de tener que vivir la angustia de hallarse entre dos partes en entendible, pero dañina competencia por su afecto, disfrute la fortuna de dos buenos hogares donde se le quiere tan entrañablemente. La abuela deberá cooperar para que se fortalezcan los lazos afectivos entre la niña y su familia en Puerto Rico. La

madre sin duda comprenderá la importancia de no debilitar los lazos emocionales de la menor con sus abuelos. De la armonía y la abnegación de las partes, más de lo que pueda hacerse en ley, es que en realidad depende el bienestar de la menor.

*Se revocará en consecuencia la sentencia recurrida y se procederá conforme a los términos de esta opinión.*

Los Jueces Asociados Señores Dávila, Martín y Negrón García concurren en el resultado sin opinión.