Vivoni del Valle, Juez Ponente
*1168 TEXTO COMPLETO DE LA SENTENCIA
La Sra. Betsy Colón y la Sra. Jeanie Dávila acuden ante nos mediante recurso de apelación, inconformes con la sentencia emitida por el Tribunal de Primera Instancia (en adelante TPI), el 26 de marzo de 2004. Mediante dicha sentencia, el tribunal otorgó la custodia permanente de la menor S.M.S.B. a la señora Dávila, y a la señora Colón y a su esposo, le fue otorgada la custodia de la menor A.M.S.B. La Sra. Betsy Colón es abuela paterna de la menor A.M.S.B. y la Sra. Jeanie Dávila es a su vez la abuela paterna de la menor S.M.S.B. Ambas menores son hijas de la Sra. Liza Ballester. Además, el TPI amplió las relaciones matemo-filiales entre las menores y su madre, la Sra. Liza Ballester.
Por los fundamentos que expondremos a continuación, revocamos la sentencia apelada, únicamente en tomo a la ampliación de las relaciones matemo-filiales.
I
El caso de marras comienza cuando el Sr. Julio Sánchez Dávila (en adelante el señor Sánchez), padre de la menor S.M.S.B., presentó la querella número 01-1205 en la Unidad de Investigaciones de la Sala de San Juan del Tribunal de Primera Instancia (en adelante Sala de Investigaciones). Según surge del expediente, la Sra. Liza Ballester y su entonces compañero consensual, el Sr. Angelo Santiago, habían dejado sola a la menor S.M. S.B. desde las 3:00 de la tarde y alegadamente pasadas las 8:00 de la noche sin que hubiesen regresado a la casa. Fue entonces que la menor S.M.S.B. llamó a su padre, el señor Sánchez, que se encontraba en Barceloneta.
A consecuencia de lo anteriormente indicado, la Sala de Investigaciones celebró una vista el 6 de marzo de 2001 y luego de escuchar a las partes, emitió una resolución el 12 de marzo de 2001. En dicha resolución dispuso que en esos momentos no era necesario remover a la menor S.M.S.B. del hogar de la Sra. Liza Ballester para concederle la custodia al señor Sánchez.
No obstante, el 15 de marzo de 2001, la Sala de Investigaciones se vio forzada a celebrar otra vista, ya que alegadamente la Sra. Liza Ballester había manifestado que antes que le quitasen a las niñas prefería matarlas y matarse ella. En ese día comparecieron la Sra. Betsy Colón (en adelante doña Betsy) —madre de Angelo Santiago, abuela paterna de la menor A.M.S.B. y la Sra. Liza Ballester y el Sr. Angelo Santiago. Luego de celebrada la vista, la Sala de Investigaciones otorgó a doña Betsy la custodia provisional de la menor A.M.S.B.
Al día siguiente, la Sala de Investigaciones se vio forzada a tomar medidas urgentes para la protección de la menor S.M.S.B. Le ordenó al señor Sánchez retener a la menor bajo su custodia hasta el día de la vista, el 20 de marzo de 2001. Además, prohibió a la Sra. Liza Ballester, al Sr. Angelo Santiago o cualquier otra persona que no fuese el señor Sánchez, a relacionarse con la menor hasta que no se dispusiera otra cosa.
Según surge del expediente, se le solicitó al Dr. Argelio López-Roca (en adelante el Dr. López-Roca) que evaluara con carácter de urgencia a la menor S.M.S.B. y que emitiera su opinión pericial respecto al daño emocional que sufriría la menor al ser separada de su madre, la Sra. Liza Ballester, frente a los peligros existentes bajo el cuido de la misma. En adición, doña Betsy le informó al Dr. López-Roca sobre un incidente en el cual la Sra. Liza Ballester le pidió que mintiera para encubrirla. Doña Betsy le comentó que cuando se negó a mentir, la Sra. Liza Ballester le gritó: “antes que me quiten las niñas, primero me mato con ellas”. En su informe, el Dr. López-Roca concluyó que las amenazas de la Sra. Liza Ballester debían tomarse muy en serio, y que la Sra. Jeanie Dávila (en adelante doña Jeanie), abuela paterna de la menor S.M.S.B., es un recurso viable *1169 para la custodia provisional de ésta.
En la vista señalada para el 20 de marzo de 2001 ante la Juez Municipal de la Sala de Investigaciones, la Sra. Liza Ballester y el Sr. Angelo Santiago informaron que habían radicado una demanda ante el Tribunal de Primera Instancia solicitando la eliminación de la custodia provisional y que se devuelvan las menores al núcleo familiar que ellos componen. La Sala de Investigaciones dispuso que la menor S.M.S.B. continuaría bajo la custodia del señor Sánchez y que las relaciones matemo-filiales entre la menor S.M.S.B. y la Sra. Liza Ballester permanecerían suspendidas.
Llamado el caso civil núm. KCU-02-0069 —instado por la Sra. Liza Ballester y el Sr. Angelo Santiago— a una vista el 10 de mayo de 2001, el tribunal apelado estableció las relaciones matemo-filiales de la siguiente manera: “Se establecen las relaciones materno-filiales todos los sábados del mes de mayo de 8:00 a 11:00 de la mañana, todos los sábados y domingos del mes de julio de 8:00 a 11:00 de la mañana. El Día de las Madres de 9 de la mañana a 2 de la tarde.” De igual forma, el tribunal mantuvo en el señor Sánchez la custodia provisional de la menor S.M.S.B. y otorgó la custodia provisional de la menor A.M.S.B. a doña Betsy. A su vez, ordenó al Programa de Relaciones de Familia del Tribunal de Primera Instancia a efectuar un estudio social sobre la custodia de las menores S.M.S.B. y A.M.S.B.
Por su parte, doña Betsy y el señor Sánchez interpusieron una reconvención ante la demanda instada por la Sra. Liza Ballester y el Sr. Angelo Santiago, solicitando que la custodia se convirtiese en una permanente y que se proveyeran alimentos para las menores. De otro lado, la señora Ballester y el señor Santiago presentaron una demanda enmendada para incluir en ella a doña Jeanie.
Según surge del expediente, la Sra. Liza Ballester aprovechó las horas de visita del 21 de octubre de 2001 para radicar una “acusación de maltrato de menores” ante el Departamento de Servicios Sociales, ya que indujo a la menor S.M.S.B. a decir que su padre, el señor Sánchez, le había pegado. Además surge que lo anterior sucedió, pues la señora Ballester quería recuperar la custodia de las menores. A tales efectos, se le solicitó al Dr. López-Roca que emitiera nuevamente una opinión pericial. Éste recomendó que se interrumpieran las visitas de la madre con la menor S.M.S.B. a fin de proteger a la menor del daño emocional que consistentemente estaba recibiendo durante las mismas. Adicionalmente, recomendó que la Sra. Liza Ballester debería recibir ayuda psiquiátrica. 
Luego del incidente antes mencionado, el tribunal interrogó a la menor S.M.S.B. y ésta admitió haber mentido. Consiguientemente, el TPI emitió una orden dejando sin efecto el plan entonces existente de relaciones matemo-filiales y ordenando un plan de visitas supervisado bajo el Programa de Trabajo Social del Departamento de Relaciones de Familia. 
Luego de varios trámites procesales, el tribunal apelado dictó la sentencia el 26 de marzo de 2004 objeto de este recurso. Según surge del expediente, al dictar sentencia evaluó prueba pericial de informes sociales forenses, a saber, el Informe Social Forense del Programa de Relaciones de Familia del 6 de agosto de 2001 y el Informe Social Complementario del 12 de marzo de 2002. En dichos informes se recomendó el permitir un plan de relaciones matemo-filiales supervisado en todo momento. Además, el tribunal acogió los informes emitidos por el Dr. López-Roca y la Dra. Doris González Torres, del Centro Interdisciplinario de Servicios Humanos. 
Ahora bien, de las determinaciones de hechos emitidas en la sentencia del 26 de marzo de 2004, se desprende que al momento de dictar sentencia, la menor S.M.S.B. presentaba, frente a su madre, la Sra. Liza Ballester, roles invertidos, pues funge como figura de protección hacia la madre en vez de ser a la inversa. Además, el tribunal reconoció que la Sra. Liza Ballester no completó la fase de tratamiento de salud mental ordenado a comienzos del pleito y que la experiencia de la Sra. Liza Ballester como madre ha estado “matizada *1170 por la inmadurez, la falta de introspección y falta de cuidado y dedicación hacia sus hijas, su nivel de juicio es liviano y su manera de ver las cosas o las circunstancias en la vida es superficialDel mismo modo, dispuso que las menores han logrado estabilidad y están seguras y protegidas en los hogares de sus actuales custodios provisionales. Por lo tanto, otorgó la custodia legal permanente de la menor S.M.S.B. a doña Jeanie, y la custodia legal permanente de la menor A.M.S.B. a doña Betsy y su esposo, el señor Eduardo Quiñones.
Sin embargo, estimó adecuado el ampliar las relaciones matemo-filiales para que las menores pudieran pernoctar en la residencia de la Sra. Liza Ballester, sin supervisión alguna, aun cuando ordenó a la Sra. Liza Ballester acreditar que se ha sometido a terapia sicológica para atender su condición de depresión.
Debemos mencionar que de los autos surge que todos los peritos, tanto los del tribunal como los de la parte apelante, coincidieron en que para las menores estar por un período de tiempo prolongado y sin supervisión con su madre, ésta tendría que recibir tratamiento psicológico y psiquiátrico.
Posteriormente, el 3 de mayo de 2004, el tribunal apelado declaró no ha lugar a la Moción sobre paralización de relaciones materno-füiales y solicitud de vista evidenciaría presentada por doña Jeanie y doña Betsy. Además nada dispuso sobre la Moción suplementaria, a la cual se anejaron los últimos informes de la doctora González y del Dr. López-Roca, emitidos luego de dictada la sentencia.
II
Inconformes con la sentencia del 26 de marzo de 2004 y con la Resolución del 3 de mayo de 2004, doña Betsy y doña Jeanie presentaron ante nos un recurso de apelación acompañado de una moción en auxilio de jurisdicción, el 28 de mayo de 2004. En resumen, en el escrito de apelación plantean que el TPI erró: 1) al ampliar las relaciones matemo-filiales de inmediato sin haber acreditado que ha recibido el tratamiento médico-psiquiátrico correspondiente, en acorde a la orden que emitió el TPI para que evidenciare dentro de 20 días de notificada la sentencia, la debida acreditación; 2) al no hacer un dictamen en cuanto a la pensión alimentaria; y 3) al no haber impuesto una suma por concepto de honorarios de abogado por temeridad a favor de la parte apelante.
El 2 de junio de 2004, este foro declaró no ha lugar la moción en auxilio de jurisdicción. Dicha resolución fue notificada el 21 de junio de 2004. Así pues, el 23 de junio de 2004, la parte apelante presentó una solicitud de reconsideración a nuestra denegatoria de la moción en auxilio de jurisdicción. Por último, la Sra. Liza Ballester compareció ante nos el 7 de febrero de 2005, solicitando la desestimación del recurso. Anejó a dicha moción, entre otros documentos, una moción en cumplimiento de orden presentada el 13 de diciembre de 2003 ante el Tribunal de Primera Instancia. En la moción presentada ante el tribunal apelado, la señora Ballester argumentó que ha sido evaluada y dada de alta por la doctora De Lucca y que llena todos los requisitos necesarios para que sus hijas puedan relacionarse con ella. No obstante, la fecha de dicho informe es del 5 de diciembre de 2002. Obviamente el informe es de fecha anterior a la sentencia emitida el 26 de marzo de 2004, en la cual se le ordenó a la señora Ballester, acreditar en 20 días que se ha sometido a terapia sicológica.
Examinados los escritos de las partes y los documentos que acompañan los mismos, procedemos a discutir el derecho aplicable.
III
En Puerto Rico, la integridad familiar, la institución de la patria potestad y las buenas relaciones filiatorias gozan de la más alta protección jurídica. Soto Cabral v. E.L.A., 130 D.P.R. 298, 322 (1995). La patria potestad es el conjunto de derechos y obligaciones que los padres tienen sobre los hijos menores no emancipados. Rodríguez Mejías v. E.L.A., 122 D.P.R. 832 (1998).
*1171 A tales efectos, el 1 de agosto de 2003 se aprobó la Ley 177, Ley para el Bienestar y la Protección Integral de la Niñez. 8 L.P.R.A. see. 444, et sec. El énfasis de la nueva ley está en el fortalecimiento de la familia, en la promoción de los valores de paz para la convivencia y en la violencia. Como parte de la política pública del Estado, se reconoce la obligación de velar por la seguridad, el mejor interés y bienestar de la adolescencia. Así, pues, cuando exista riesgo a ese bienestar y en su lugar la violencia constituya un modo de relacionarse, el Estado debe intervenir en los asuntos privados de la familia.
La custodia de los hijos es un atributo inherente de la patria potestad, aunque una y otra sean tratadas a veces por la ley y la jurisprudencia como figuras distintas. Art. 153 del Código Civil, 31 L.P.R.A. see. 601; Torres, Ex Parte, 118 D.P.R. 469, 476 (1987). La custodia es la “facultad, y al mismo tiempo la obligación legal de los padres de tener diariamente en su compañía a los hijos no emancipados en pos de su bienestar”. Colón Vázquez, Ex parte, 126 D.P.R. 337,343 (1990) (Alonso Alonso, J., voto de conformidad). Al determinar la custodia de menores, los tribunales “deben guiarse principalmente por el bienestar y los mejores intereses del menor”, ya que éstos constituyen la piedra angular de la política pública. Marrero Reyes v. García Ramírez, 105 D.P.R. 90, 104 (1976).
Como muy bien ha dicho nuestro Tribunal Supremo, determinar cuál es el bienestar del menor no es tarea fácil, ya que están envueltos factores emocionales, físicos e incluso especulativos, que en algunas ocasiones no pueden ser demostrados científicamente. No obstante, claro está, nuestra jurisprudencia ofrece ciertas guías para dirigir la tarea decisoria de los jueces y juezas. En Nudelman v. Ferrer Bolívar, 107 D.P.R. 495, 511 (1978), nuestro más alto Foro señaló algunos .de los factores que los tribunales deben considerar para determinar el bienestar del menor al adjudicar casos de custodia. Así, es necesario que los tribunales consideren: la preferencia del menor, su sexo, edad, salud mental y física; el cariño que pueden brindarle las partes en controversia; la habilidad de las partes para satisfacer las necesidades afectivas y morales del menor; la interrelación del menor con las partes y con otros miembros de la familia; y la salud psíquica de las partes. Además, debe considerar la razonabilidad de las relaciones solicitadas a la luz dé las actividades diarias del custodio y del menor.
Así, por ejemplo, a los padres y madres se les puede privar, suspender o restringir la custodia de sus hijos, e incluso de la patria potestad, cuando no pueden satisfacer las necesidades de los menores, protegerlos adecuadamente o cuando los menores son maltratados, de acuerdo con la Ley para el Bienestar y la Protección Integral de la Niñez, supra. De igual forma, los Arts. 166A al 166C del Código Civil, 31 L.P.R.A. secs. 634a-634c, establecen las causas para privar, suspender o restringir la patria potestad y la custodia. Las referidas medidas legislativas responden al interés del Estado en asegurar el bienestar emocional y físico de los menores de edad. Nudelman v. Ferrer Bolívar, supra, a la pág. 508 (1978).
De otro lado, el Tribunal Supremo estableció que la relación patemo-filial está protegida constitucionalmente por el derecho a la libertad garantizado por la enmienda XIV, Enmienda de la Constitución de Estados Unidos. Por lo tanto, salvo en circunstancias extraordinarias, una parte a quien se le ha concedido la patria potestad y custodia de sus hijos menores no debe ser despojada de ésta en forma sumaria sin ser escuchada. Siempre que sea factible, el tribunal debe tener el beneficio de la posición de las dos partes que se disputan la custodia de un menor. Santana v. Acevedo, 116 D.P.R. 298 (1985).
En Sterzinger v. Hon. Ramírez, 116 D.P.R. 762 (1985), nuestro Tribunal Supremo reconoció el derecho del padre o madre no custodios a la privacidad e intimidad en las relaciones con sus hijos. En cuanto a ese derecho, dispuso que el mismo es de tal jerarquía que los tribunales, si bien pueden regular las relaciones patemo-filiales, no pueden prohibirlas totalmente a menos que existan causas muy graves para hacerlo. Se trata no sólo de un derecho, sino más bien de un deber concebido antes que nada, para el beneficio del menor. Así, durante el tiempo en que el padre o madre no custodio tiene la custodia física de su hijo, tiene deberes implícitos al ejercicio de su derecho: alimentarlo, cuidarlo y velar por su salud física y emocional.
*1172 Sabido es también que la obligación de los progenitores de proveer alimentos a sus hijos menores de edad es parte esencial del derecho a la vida. Art. II Sec. 7 de la Constitución del Estado Libre Asociado, 1 L.P.R.A. Art. II, Sec.7. Véase Ríos Sánchez v. Narváez Calderón, Opinión de 31 de diciembre de 2004, 163 D.P.R. _ (2004), 2004 J.T.S. 3; McConnell v. Palau, Opinión de 5 de mayo de 2004, 161 D.P.R. _ (2004), 2004 J.T.S. 73.
Dicha obligación emana, además, de los Arts. 118, 143 y 153 del Código Civil de Puerto Rico. 31 L.P.R.A. sees. 466, 562 y 601. Ciertamente, los hijos legítimos tienen derecho a recibir alimentos. 31 L.P.R.A. see. 466. Así, pues, la obligación de dar alimentos será exigible desde que los necesitare para subsistir la persona que tuviere derecho a percibirlos; pero no se abonarán, sino desde la fecha en que se interponga la demanda. 31 L.P. R.A. see. 566. Del mismo modo, el padre y la madre tienen respecto de sus hijos no emancipados, el deber de alimentarlos. 31 L.P.R.A. see. 153. En resumen, el deber de proveer alimentos a los hijos menores de edad surge de la relación patemo-filial y se origina en el momento en que la paternidad o maternidad quedan legalmente establecidas. Martínez v. Rodríguez, Opinión del 13 de agosto de 2003, 160 D.P.R. _ (2004), 2003 J.T.S. 136.
IV
En cuanto a la imposición de honorarios de abogado, la Regla 44.1(d) de las de Procedimiento Civil, 32 L. P.R.A. Ap. Ill, R. 44.1(d), dispone:

“Regla 44.1. Las costas y honorarios de abogados

d) Honorarios de Abogado-En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. ”

El propósito de la imposición de honorarios por temeridad es penalizar al litigante perdidoso que por su “terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito”. Jarra Const. v. Axxis Corp., Opinión de 30 de noviembre de 2001, 155 D.P.R. _ (2001), 2001 J.T.S. 167; Blás Toledo v. Hospital, 146 D.P.R. 267, 334 (1998); Fernández v. San Juan Cement Co., Inc., 118 D.P.R. 713, (1987). Se penaliza la acción de hacer necesario un pleito que se pudo evitar. Domínguez v. GA Life, Opinión de 12 de julio de 2002, 157 D.P.R. _ (2002), 2002 J.T.S. 110; Blas Toledo v. Hospital, supra, a la pág. 335; Fernández v. San Juan Cement Co., Inc., supra.
La norma general imperante en nuestro ordenamiento procesal civil establece que la parte victoriosa siempre tiene derecho a recobrar las costas. En cuanto a los honorarios de abogado, éstos sólo proceden cuando el tribunal determina que la parte perdidosa actuó con temeridad. Montañez López v. U.P.R., Opinión de 21 de marzo de 2002, 156 D.P.R. _ (2002), 2002 J.T.S. 40. Al fijar la cuantía, el tribunal debe tomar en consideración:

“1) el grado de temeridad,

2) la naturaleza del procedimiento,

3) los esfuerzos y actividad profesional que se desplegó,

4) la habilidad y reputación de los abogados”.

*1173 Véase Santos Bermúdez v. Texaco P.R., Inc., 123 D.P.R. 351, 355-357 (1989).
Hay que recordar, claro está, que la imposición de honorarios de abogado y su cuantía es puramente discrecional. Blás Toledo v. Hospital, supra, a la pág. 334; Revlon v. Las Américas Trust Co., 135 D.P.R. 363, 376 (1994). Sin embargo, en aquellos casos en que los tribunales inferiores abusen de su discreción, los tribunales apelativos podemos revisar su actuación. Jarra Corporation v. Axxis Corporation, supra. El concepto de temeridad al que alude la Regla 44.1(d), supra, no ha sido definido, pero nuestro Tribunal Supremo ha ido perfilando sus contornos. Dr. José A. Cuevas Segarra, Tratado de Derecho Procesal Civil, Publicaciones J.T.S., Tomo II, 2000, a la pág. 729. Por ejemplo, se ha dicho que la acción que amerita la condena de honorarios es cualquiera que haga necesario un pleito que se pudo evitar. Corpak Inc. v. Ramallo Brothers, 125 D.P.R. 226, 233 (1990).
Desde luego, un tribunal abusa de su discreción, si emite una decisión ignorando las normas jurídicas aplicables, provocando un resultado irrazonable y arbitrario. RBR Const. S.E. v. Autoridad de Carreteras, 149 D.P.R. 836, 856-857 (1999). El tribunal, en el ejercicio de su discreción, está atado al concepto de razonabilidad, para llegar a una conclusión y dictamen justiciero, sin hacer abstracción del derecho. Ramírez v. Policía de P.R., Opinión de 26 de diciembre de 2002, 158 D.P.R. _ (2002), 2003 J.T.S. 3. De esta manera, la imposición de los honorarios de abogado no será revisada en apelación a menos que el tribunal sentenciador haya cometido un abuso de discreción, lo cual corresponde a la parte apelante demostrar. Feliciano Polanco v. Feliciano González, 147 D.P.R. 722, 729 (1999); CNA Casualty de P.R. v. Torres Díaz, 141 D.P.R. 27, 44 (1996); Ramírez Anglada v. Club Cala de Palmas, 123 D.P.R. 339, 350 (1989).
V
A los fines de resolver la principal controversia de marras, primeramente tenemos que determinar si el TPI erró al ampliar las relaciones materno-filiales sin haber tenido constancia, mediante la debida acreditación, que la Sra. Liza Ballester se encontraba mentalmente capacitada para ello, y en detrimento del bienestar de las menores. Con la evidencia que tenemos ante nos, contestamos dicha interrogante en la afirmativa. Veamos.
Del expediente surge que luego de dictada la sentencia apelada se emitieron informes adicionales que el Tribunal de Primera Instancia obvió en su totalidad. A saber, la doctora González emitió un informe el 15 de abril de 2004 y expresó que a su entender la Sra. Liza Ballester no ve a los custodios como facilitadores, sino que para ella son una amenaza, ya que “por su propia inmadurez no puede anteponer la seguridad de sus hijos a sus propios deseos.” Recomendó que se le debería dar ayuda terapéutica a la Sra. Liza Ballester, y que para sostener los lazos afectivos entre las menores y la Sra. Liza Ballester, podrían pasar un día de la semana juntas. No obstante, enfatizó que en ningún momento las menores deben ser “arriesgadas a pernoctar en un hogar que ha probado ser altamente negligente”. 
De igual forma, el Dr. López-Roca emitió un informe el 19 de abril de 2004, en el cual expresó su preocupación en tomo a la ampliación de las relaciones matemo-filiales, ya que las menores no tienen recuerdos de lo que es pasar toda una noche fuera de su hogar sin estar acompañadas por las personas que las cuidan. El Dr. López-Roca expresó que a su entender las menores corren riesgo y considera que no es aceptable que el tribunal hubiese permitido que las menores pernoctaran sin supervisión alguna. Recomendó que se debe obtener verificación escrita de que la Sra. Liza Ballester ha completado satisfactoriamente el proceso psicoterapéutico de ayuda para poner controles eficientes, no maltratantes, a las menores y que tiene su depresión bajo control. 
Como parte de la prueba considerada por el TPI, está el Informe Social Forense del Programa de Relaciones de Familia del 6 de agosto de 2001 y el Informe Social Complementario, que podemos considerar como prueba pericial del tribunal. Aparte de que por este sólo hecho es de suponer que el peritaje no responde a la tendencia natural de proteger o representar los intereses de alguno de los litigantes —como suele suceder con los peritos *1174 de las partes en otros contextos litigiosos — , los Informes Sociales del 6 de agosto de 2001 y del 12 de marzo de 2002 presentan de manera bastante equilibrada y objetiva la situación personal y familiar de las personas involucradas en este litigio. En el informe se recomienda que la señora Ballester debe continuar asistiendo a la Clínica de Salud Mental, a los fines de revisar el plan de relaciones matemo-filiales para poder ampliarlo. Por su parte, el informe emitido el 12 de marzo, recomienda que el plan de relaciones matemo-filiales debe ser supervisado en todo momento.
Con todo y lo deferente que podemos y debemos ser con la apreciación de la pmeba que hizo el TPI, existe amplia pmeba pericial y documental que no deja lugar a dudas en cuanto a que la Sra. Liza Ballester no ha acreditado que tiene la capacidad emocional para que proceda la ampliación de las relaciones matemo-filiales. No se trata de eliminar las relaciones matemos-filiales, pero hay que tomar las medidas adecuadas y la supervisión para velar por los mejores intereses de las menores. Es importante que las menores conozcan de manera clara sus orígenes e identifiquen el parentesco con sus familiares para lograr un desarrollo emocional saludable. Tanto doña Jeanie como doña Betsy, que son abuelas, deben clarificar su rol custodio para evitar enajenar la figura materna. De igual forma, las menores S.M.S.B. y A.M.S.B. no deben ser expuestas a más cambios repentinos que puedan impactar negativamente su desarrollo social y emocional.
En síntesis, la sentencia apelada es contradictoria pues primeramente amplía las relaciones materno filiales para que las menores pernocten en el hogar de su madre y a la misma vez le ordena a ésta acreditarle al tribunal en 20 días que se ha sometido a terapia sicológica con el propósito de atender su condición de depresión. Entendemos que al ordenar dicha acreditación es la mejor evidencia de que el TPI tiene dudas en tomo a la capacidad mental de la Sra. Liza Ballester. Por lo tanto, el tribunal apelado debe constatar la acreditación requerida antes de considerar ampliar las relaciones matemo-filiales.
En cuanto al segundo señalamiento de error, se ordena al TPI fijar una pensión alimentaria a favor de las menores S.M.S.B. y A.M.S.B conforme al derecho aplicable.
No obstante, resolvemos que el TPI no erró al no haber impuesto una suma por concepto de honorarios de abogado por temeridad a favor de la parte apelante, ya que el tribunal es el que determina, a su discreción, si la parte perdidosa fue temeraria. Como expresamos anteriormente, la jurisprudencia aplicable reconoce la amplia discreción del TPI para imponer honorarios de abogado, y que los tribunales apelativos podrán revisar su actuación cuando haya un claro abuso de discreción. La Sra. Liza Ballester instó su demanda para recobrar la custodia de sus hijas y el tribunal entendió que en este momento no procedía su reclamo. Si ella logra acreditar su capacidad mental, puede mantener las relaciones matemo-filiales, y en su día, inclusive, podría recobrar la custodia de sus hijas.
VI
Con estos antecedentes, se revoca la sentencia apelada en cuanto a la ampliación de las relaciones matemo-filiales. Hasta tanto se acredite ante el TPI la estabilidad emocional y la salud mental de la madre, las relaciones matemo-filiales deberán ser supervisadas en todo momento.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal.
Laura Vélez Vélez
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2005 DTA 58
1. Sra. Liza Ballester y el señor Sánchez procrearon a la menor S.M.S.B. durante su matrimonio. La menor nació el 10 de febrero de 1993 y para la fecha del incidente tenía unos 8 años de edad y sus padres estaban divorciados.
*1175 2. Véase resolución en el apéndice 56 del escrito de apelación, págs. 176-177.
3. Luego de divorciarse del señor Sánchez, Sra. Liza Ballester se unió consensualmente con Angelo Santiago y procrearon a la menor A.M.S.B. La menor nació el 20 de agosto de 1999.
4. Véase Minuta del 10 de mayo de 2001, Apéndice 51 del escrito de Apelación, a la pág. 167.
5. Véase Opinión Pericial Urgente, Apéndice del escrito de apelación, págs. 141-142.
6. Las visitas estarían supervisadas por la Trabajadora Social, Carmen L Martínez del Valle.
7. El Tribunal de Primera Instancia consideró los informes del Dr. López-Roca emitidos el 19 de marzo de 2001, el 23 de octubre de 2001 y el 13 de junio de 2002.
8. El tribunal considéró los informes de la Dra. González emitidos el 17 de mayo y el 17 de agosto de 2002.
9. La referida sentencia fue notificada el 10 de mayo de 2004.
10. Entre las causas enumeradas en los referidos artículos se encuentran:

"a) ocasionar o poner en riesgo sustancial de sufrir daño o perjuicio a la salud física, mental o emocional y moral del menor o permitir o tolerar que otra persona lo ocasione;

b) dejar de tener en su compañía al menor, dejar de supervisarlo, proveerle alimentos, ropa, albergue, educación o cuidados de salud conforme a sus medios de fortuna;

c) faltar al deber de supervisión y cuidados del menor cuando éste se encuentra en la custodia de otra persona;

d) incurrir en abandono voluntario del menor;

e) explotar al menor obligándolo a realizar cualquier acto con elfin de lucrarse de alguna forma;

f) incumplir con el plan de servicios para reintegrar a un menor a su hogar;

g) incurrir en conducta constitutiva de los delitos de asesinato, homicidio u homicidio involuntario o sus tentativas; delitos contra la vida e integridad corporal; violación; sodomía; actos lascivos; incumplimiento con la obligación de alimentar; abandono de menores; maltrato, entre otros; ’’

11. Véase Apéndice 13 del escrito de apelación, a las págs. 40-47.
12. Véase Apéndice 7 del escrito de apelación, a las págs. 18-21.