READY MIX CONCRETE, INC., demandante y recurrente, *v.* RAMÍREZ DE ARELLANO & CO., INC., y EDUARDO FERRER BOLÍVAR, demandados; CHICAGO TITLE INSURANCE COMPANY, interventora-recurrida.

*Número:* R-79-443     *Resuelto:* 21 de abril de 1981

*McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz Suria* y *Néstor M. Méndez Gómez,* abogados de la demandante; *Edilberto Berríos Pérez,* abogado de la interventora-recurrida Chicago Title Insurance.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

Para asegurar la efectividad de la sentencia en un pleito sobre cobro de dinero, Ready Mix Concrete, Inc. obtuvo mandamiento de embargo por la suma de $45,000.00 contra los demandados Ramírez de Arellano & Co., Inc. y Eduardo Ferrer Bolívar.

El embargo se ejecutó, anotándolo en el Registro de la Propiedad, sobre una finca en que se encuentran enclavados dos edificios de apartamientos, sometida anteriormente por Ramírez de Arellano al régimen de propiedad horizontal con el nombre de Condominio Garden Hills Estates.

Luego de constituirse el régimen de propiedad horizontal, pero antes de anotarse dicho embargo, Ramírez de Arellano había enajenado ochenta apartamientos que fueron inscritos como fincas independientes. Luego del embargo, enajenó otros dieciséis apartamientos [1] que también fueron inscritos como fincas independientes, pero sujetos al referido embargo de $45,000.00 previamente anotado.

Algún tiempo después, la Chicago Title Insurance Co. presentó moción de intervención, alegando que era la aseguradora del título de varias hipotecas otorgadas por compradores de apartamientos en Garden Hills Estates, a favor del Chase Manhattan Bank, N. A. y que las pólizas emitidas por Chicago a favor del Chase aseguraban a éste que las hipotecas constituidas eran primeras hipotecas. Alegó, además, que de prevalecer el embargo de Ready Mix, ella (Chicago) sería responsable al Chase por cualquier pérdida que pudiera sufrir como consecuencia de tal embargo. En la súplica, Chicago pidió al tribunal que decretase la nulidad del embargo. Obtuvo su levantamiento mediante la prestación de una fianza de $45,000.00.

Chicago presentó moción en solicitud de que se dictara sentencia sumaria. El tribunal la dictó. Determinó que el embargo era nulo y que procedía la cancelación de la fianza prestada por Chicago para levantarlo. Fundó su decisión en que los apartamientos se segregaron "como cuestión de derecho al otorgarse e inscribirse la escritura matriz, sometiendo el inmueble al Régimen de Propiedad Horizontal".

---

[1] Dichas enajenaciones se realizaron mediante el otorgamiento de escrituras públicas de "Segregación, Liberación y Compraventa".

Ready Mix recurrió y acordamos revisar. Apunta como primer error que Chicago Title Insurance Co. no tiene derecho a intervenir.

Chicago Title es una compañía aseguradora de títulos. En la póliza que emitió a favor del Chase, se obligó a garantizar que las hipotecas constituidas en las venta de los apartamientos en cuestión fuesen gravámenes preferentes. En el pleito principal de cobro de dinero, Chase, acreedor hipotecario, no compareció para impugar la legalidad del embargo, como tampoco los titulares de los dieciséis apartamientos afectados. (²)

La Regla 21.1 de Procedimiento Civil de 1979 dispone que cualquier persona tiene derecho a intervenir en un pleito cuando reclame algún derecho o interés en la propiedad o asunto objeto del litigio, que, de hecho, pudiese quedar afectado con la disposición final del caso. (³) Aun bajo el texto anterior de la regla que exigía como requisito adicional que el interés de la parte interventora estuviese inadecuadamente representado, Chicago Title Insurance Co., en las circunstancias presentes en este caso, tenía derecho a intervenir. (⁴) La

---

(²) Chase únicamente se limitó a presentar una instancia al Registrador de la Propiedad de San Juan, Sección Sexta, donde sustancialmente alegó que el embargo trabado por Ready Mix fue sobre el terreno en donde enclavaban los edificios de Garden Hills Estates, terreno que constituye un elemento común por existir sobre el mismo un régimen de propiedad horizontal. También expuso en la referida instancia que "5 . . . el Chase Manhattan Bank N. A. es parte interesada afectada por esta anotación, por ser la entidad financiera que está facilitando los préstamos hipotecarios sobre los apartamientos vendidos o en proceso de venta y dicha anotación de embargo afecta la validez y negociabilidad de los pagarés expedidos a favor de esta Institución con garantía hipotecaria sobre los apartamientos". "Chase", entonces, se circunscribe a solicitar del Registrador la rectificación de este "error".

(³) Dispone así dicha Regla:

"Mediante oportuna solicitud, cualquier persona tendrá derecho a intervenir en un pleito (a) cuando por ley o por estas reglas se le confiere un derecho incondicional a intervenir; o (b) cuando el solicitante reclame algún derecho o interés en la propiedad o asunto objeto del litigio que pudiere de hecho quedar afectado con la disposición final del pleito."

(⁴) El texto anterior de la Regla 21.1 disponía:

"Mediante oportuna solicitud, cualquier persona tendrá derecho a in-

actual redacción de la regla recoge la tendencia expansionista que viene manifestándose en esta área procesal desde que en 1966 se enmendó la Regla 24 federal de la cual procede nuestra Regla 21 para permitir con mayor liberalidad la intervención de personas no incluidas originalmente como partes en un pleito. El criterio para determinar si se reconoce o no el derecho de intervención es práctico y no conceptual, 3B *Moore's Federal Practice: Civil* sec. 24.03. La utilidad de este mecanismo procesal estriba en ofrecer protección a un nutrido e indefinido grupo de personas con variados intereses, en ocasiones de tremenda importancia pecuniaria o legal, 3B Moore, *supra*, sec. 24.02 *et seq.*

■ En este caso, como los llamados en primer término a defenderse de los efectos del embargo no lo hicieron, Chicago Title podía ser afectada adversamente por la ejecución de la sentencia que pudiera dictarse en su día. Chase, por su relación de asegurado con Chicago Title, tenía una forma de resarcirse por la posible pérdida de su garantía hipotecaria, más no así Chicago Title, quien garantizaba a Chase que las hipotecas tenían rango preferente. Cualquier declaración en contrario del tribunal, obligaba a Chicago Title a indemnizar a Chase conforme a los términos pactados en la póliza. El hecho de haberse anotado el embargo, unido ello a la incomparecencia de Chase y de los titulares de los apartamientos, así como las posibles consecuencias últimas del embargo, constituían un interés en el asunto objeto del litigio lo suficientemente importante como para justificar el reconocerle a Chicago Title derecho a intervenir en el presente caso al amparo de la Regla 21.1 (b).

---

tervenir en un pleito (a) cuando por ley o por estas reglas se le confiere un derecho incondicional a intervenir; o (b) cuando la representación del interés del solicitante por las partes ya en litigio fuere o pudiere resultar inadecuada y el solicitante fuere o pudiere ser afectado por la sentencia en el pleito; o (c) cuando el solicitante pudiere ser afectado adversamente por una distribución o cualquier otra disposición de propiedad que se hallare bajo la custodia o sujeta al control o poder de adjudicación del tribunal."

Los demás señalamientos de error que apunta la recurrente pueden estimarse comprendidos en la siguiente interrogante: ¿en qué momento, desde el punto de vista jurídico, se individualizan como fincas los distintos apartamientos de un edificio sometido al régimen de propiedad horizontal? El fijar ese momento resulta determinante en la solución de la controversia que plantea este recurso, o sea, si en efecto el embargo trabado por la recurrente Ready Mix grava o no los dieciséis apartamientos vendidos e inscritos con posterioridad a la anotación del embargo.

La constitución del régimen de propiedad horizontal comienza con el trámite de inscribir en el Registro de la Propiedad la escritura matriz del edificio que desea someterse a dicho régimen al amparo de la Ley de Propiedad Horizontal. *Consejo de Titulares* v. *Vargas*, 101 D.P.R. 579, 582 (1973).

■ Ahora bien, el mero hecho de la inscripción de la escritura matriz, ¿opera *ex propio vigore* como una segregación de los apartamientos constituida en régimen horizontal? El hecho de estar sometido un edificio al régimen de propiedad horizontal y que dicho edificio tenga disponible apartamientos susceptibles de propiedad separada, ¿equivale en su efecto jurídico a la creación extrarregistral, por operación de ley, de fincas autónomas y separadas?

El Art. 4 de la Ley de Propiedad Horizontal, 31 L.P.R.A. sec. 1291b, dispone como sigue:

*Una vez se haya constituido el inmueble en régimen de propiedad horizontal,* los apartamientos expresados en la sec. 1291a de este título *podrán* individualmente *transmitirse* y *gravarse* y ser objeto de dominio o posesión . . . con independencia total del resto del inmueble de que formen parte, y los títulos correspondientes serán inscribibles en el Registro de la Propiedad de acuerdo con lo dispuesto en este Capítulo y en la Ley Hipotecaria. (Énfasis suplido.)

■ La ley, como se ve, claramente exige que los apartamientos sean previamente señalados e individualizados dentro

de la finca matriz. Lo que arguye entonces la recurrida es que una vez así señalados e individualizados, en efecto constituyen para todo propósito práctico o legal, fincas separadas. No tiene razón. Roca Sastre sostiene que "[l]a constitución de propiedad horizontal no implica división material de la finca edificada o en estado de edificación, sino sujeción o sometimiento de la propiedad de la misma al régimen específico de propiedad horizontal, pues incluso en el caso de división de finca en copropiedad para sujetarla a propiedad horizontal, hay que distinguir entre la división propiamente dicha como cese de la comunidad y la constitución del régimen de propiedad horizontal". *Derecho Hipotecario*, 7ma ed., 1979, Vol. III, pág. 363.

Y Ventura-Traveset, comentando una disposición análoga a la Sec. 1291b antes transcrita opina que un inmueble sometido al régimen horizontal: ". . . pierde tal carácter unitario para convertirse en un conjunto de apartamentos diferenciados . . . susceptibles de aprovechamiento independiente, que jurídicamente adquieren singularidad al devenir objeto de propiedad separada". *Derecho de Propiedad Horizontal*, 3ra ed., Barcelona, Ed. Bosch, 1976, pág. 70. Aún más, es de opinión dicho autor que el acto constitutivo de someter un edificio al régimen de propiedad horizontal, de un lado, y la individualización de los apartamientos en fincas separadas, de otro, ocurre jurídicamente en dos momentos distintos, aun cuando en el espacio y el tiempo ambas transacciones se consignen en un mismo instrumento público. A tales efectos señala:

El propietario o propietarios de un edificio en su conjunto quieren vender de momento un solo piso. Al efecto hacen la declaración formal de que han decidido constituir el régimen de propiedad horizontal.

Esta declaración se inscribe en la finca matriz . . . .

Al parecer, hay que distinguir dos momentos: la constitución del régimen y la separación de cada uno de los pisos. *Op. cit.*, pág. 148.

Batlle igualmente entiende que la constitución de un edificio en régimen horizontal no opera automáticamente para hacer de los apartamientos fincas autonómas de la finca matriz. En cuanto a ello comenta:

"Este negocio jurídico no entraña un acto de división material del edificio . . . [c]uando previamente no hay comunidad, como sucede en los casos del propietario único que vende por pisos y de los constructores que previamente han establecido esta forma de propiedad, que no es comunidad, es un contrasentido hablar de división." Batlle, *La Propiedad de Casas por Pisos,* 7 ed., Alcoy, España, Editorial Marfil, 1973, pág. 83.

Al anotarse el embargo en el Registro de la Propiedad, los *dieciséis* apartamentos afectados aparecían todavía sin inscripción y número de finca aparte, y sí descritos en el asiento de la finca matriz a nombre de Ramírez de Arellano & Co., Inc., dueña original del inmueble constituyente del régimen de propiedad horizontal, según ordenado en el Art. 26 de la Ley de la Propiedad Horizontal, enmendado. 31 L.P.R.A. sec. 1292d. Por tanto, los dueños de los apartamientos vendidos luego de trabado el embargo, como también Chase y Chicago, tenían o debieron tener conocimiento de las cargas que arrastraba la finca matriz, cargas que pesaban también sobre los apartamientos que aún no habían sido segregados y vendidos. Dicho conocimiento se presume por la esencial publicidad que hacía el Registro de estos hechos en sus anotaciones en la finca matriz. A estos efectos resultan pertinentes los siguientes comentarios :

. . . el tercero debe considerar que le afecta tanto lo que consta en la inscripción separada del local o piso que adquiere, como lo que consta en la inscripción del edificio total, del que el mismo forma parte, bien sean los Estatutos, las reglas del título constitutivo, así como las cargas, hipotecas y demás gravámenes que puedan estar constituidos sobre el total del edificio.

El Registro para el tercero y para todos estará siempre formado por ambos folios registrales: el del edificio total y el del piso o local independiente. C. Altarriba Sivilla, *Los Principios*

*Hipotecarios y la Propiedad Horizontal,* 51 Revista Crítica de Derecho Inmobiliario, pág. 93.

Si ello es así cuando el apartamiento constituye legalmente una finca separada, con más razón debe serlo cuando aún no ha sido segregado de la finca original y enajenado, sino meramente individualizado con miras a poder segregarlo y enajenarlo posteriormente.

*Procede, por tanto, revocar la sentencia recurrida y dictar otra en que se declaren válidos los embargos trabados en los apartamientos envueltos en el presente recurso.*

El Juez Asociado Señor Rigau no intervino.