En el Tribunal Supremo de Puerto Rico

| | |
|---|---|
| DEPARTAMENTO DE LA FAMILIA<br>      Demandante<br><br>      V.<br><br>CANDIDA R. SOTO Y MANUEL AYALA PEREZ<br><br>      Demandados<br><br>ALBA VIGUIE MUÑOZ, CHARLES R. RUFF<br><br>        Recurridos<br><br>PROCURADOR ESPECIAL DE RELACIONES DE FAMILIA<br><br>        Peticionario | Certiorari<br><br>99TSPR19 |

Número del Caso: CC-98-529, CC-99-549 CONS.

Abogados de la Partes Peticionarias:
En el CC-98-529 -Hon. Carlos Lugo Fiol, Procurador General
           Lic. Lizette Mejías Avilés, Procurador General Auxiliar
En el CC-98-549 – Lic. Luis A. Bonilla Espada

Abogado del Departamento de la Familia: Lic. Mario J. Portela González

Abogados de la Parte Recurrida: Lic. Angel R. Matos González

Abogados de la Parte Interventora:

Tribunal de Instancia: Superior, Caguas

Juez del Tribunal de Primera Instancia: Hon. Rita L. Pruetzel González

Tribunal de Circuito de Apelaciones: VI Caguas, Humacao, Guayama

Juez Ponente: Hon. Pesante Martínez
Panel integrado por : Pres. Juez Brau Ramírez y los Jueces Colón Birriel y Pesante Martínez

Fecha: 3/2/1999

Materia:

        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correciones del
        proceso de compilación y publicación oficial de las
        decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

DEPARTAMENTO DE LA FAMILIA
        Demandante
            v.
CÁNDIDA R. SOTO Y MANUEL
AYALA PÉREZ
        Demandado

                                    CC-98-529        Certiorari
ALBA VIGUIE MUÑOZ, CHARLES R.       CC-98-549
RUFF                                   Cons.
        Recurridos
            v.
PROCURADOR ESPECIAL DE
RELACIONES DE FAMILIA
        Peticionario


Opinión del Tribunal emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO


San Juan, Puerto Rico, a 2 de marzo de 1999.


Nos corresponde interpretar por primera vez el Artículo 30(g)[1] de la Ley Núm. 75 de 28 de mayo de 1980, según enmendada, conocida como la Ley de Protección a Menores. Debemos determinar cuál es el grado participación de los custodios de facto dentro de los procesos de privación a los padres biológicos de la patria potestad y custodia de sus hijos menores de edad, mientras éstos se encuentran temporeramente bajo custodia en hogares sustitutos.

---

[1] 8 L.P.R.A. sec. 430(g).

I

El 14 de noviembre de 1994 el Departamento de la Familia, en adelante el Departamento, presentó una "Petición" en la cual alegaba que cinco de los hijos menores de la señora Cándida Soto estaban viviendo en condiciones inadecuadas[2] al carecer de los recursos básicos para vivir. A saber, les faltaban enseres del hogar, ropa, artículos escolares, entre otros. Que a pesar de los esfuerzos desplegados por el Departamento para mejorar su condición, la situación de estos menores no había mejorado. El 15 de noviembre de 1994 el Tribunal Municipal de Caguas ordenó que los menores fueran puestos inmediatamente bajo la custodia provisional del Departamento. Sin embargo, con el fin ulterior de devolver los menores al seno del hogar, el Departamento implementó un plan de servicios. En consecuencia, todos los menores fueron ubicados en hogares de crianza bajo el cuidado de custodios de facto. Cónsono con el plan se presentó el primer informe de la Técnica de Servicios Sociales asignada al caso y el 29 de marzo de 1995 se celebró en el Tribunal Superior[3] la Vista de Ratificación, en la cual se mantuvo la decisión de concederle al Departamento la custodia provisional de los menores. Según se desprende de informes posteriores, inicialmente no se obtuvo una respuesta positiva al plan de servicios por parte de la señora Soto y el señor Ayala, debiéndose ello en gran medida a la crítica condición de pobreza en la cual vivían.

Así las cosas, el 8 de septiembre de 1995 –contando M.A.S. apenas (4) meses de vida– se presentó una nueva "Petición" por el

---

[2] Al momento de la "Petición" la señora Soto vivía con el señor Luis Martínez, padre de los cinco menores. Posteriormente, se separaron y la señora Soto comenzó una nueva relación sentimental con el señor Manuel Ayala de quien quedó embarazada. El 6 de mayo de 1995 nació el menor M.A.S. quien es el eje central de la controversia en este caso. Al señor Ayala el Departamento lo incluyó en el plan de servicios diseñado para este hogar.

[3] Caso civil Núm. EMM94-0064.

Departamento. En ésta se alegaba que los padres biológicos de M.A.S. lo estaban alimentando con agua de azúcar ya que no tenían dinero para comprarle leche y que la que le habían podido conseguir se les había dañado por falta de energía eléctrica.

Por orden de un juez municipal M.A.S. fue removido del hogar de sus padres. Se le concedió provisionalmente la custodia al Departamento y se ubicó al menor en el hogar de la señora Alba Viguie Muñoz y el señor Charles R. Ruff. Estos suscribieron un acuerdo con el Departamento donde convinieron que actuarían como hogar sustituto.[4] En el ínterin se efectuaron varias vistas de revisión. El 19 de julio de 1996 los custodios de facto solicitaron intervenir en el pleito para que se le concediera la custodia legal del menor M.A.S. al Departamento, o en la alternativa a ellos.

El 28 de agosto de 1996 se efectuó otra vista de revisión. En ésta los padres biológicos del menor se opusieron a la solicitud de intervención de los custodios de facto verbalmente y luego por escrito. Asimismo, el Departamento solicitó que la próxima vista fuera de privación de patria potestad ya que, aún cuando había transcurrido un lapso de tiempo en exceso del año, los padres biológicos no habían cumplido con el plan de servicios.

Luego de varias posposiciones se señaló la vista de privación de patria potestad para el 8 de septiembre de 1997.[5] Ese día, la

---

[4] Véase el "Convenio de Servicios a Prestar en un Hogar Sustituto o en un Hogar o Centro de Cuidado Diurno". Apéndice, págs. 197-198. Entre las responsabilidades de los custodios de facto figuraba observar al menor y compartir información con el Departamento y los padres del menor cuando fuera recomendable. Se responsabilizaron, además, de atender y cuidar al menor hasta tanto el Departamento entendiera que era necesario. Específicamente, contiene una cláusula que dispone que la Segunda Parte, entiéndase los custodios de facto: "(r)econocen[n] que retendrá[n] a estas personas en su facilidad hasta que el Programa de Servicios a Familias con Niños del Departamento de Servicios Sociales así lo crea necesario."

[5] El 29 de agosto de 1997, días antes de la vista, el Departamento presentó una "Moción de Desistimiento de Privación de Patria Potestad" en la cual reconoció que la conducta de los padres biológicos estaba cambiando y que éstos estaban demostrando

Juez de instancia manifestó que la vista se celebraría en cámara y denegó la intervención como partes de los custodios de facto.[6] Acogió la moción de desistimiento y señaló otra vista de revisión para el 14 de enero de 1998. En ésta se reflejó que los padres biológicos continuaban cumpliendo con el plan de servicios. Se señaló otra vista de revisión para el 18 de marzo de 1998.[7] En ella el Tribunal dispuso que se comenzara la entrega escalonada de la custodia física de los menores a sus padres biológicos. M.A.S. sería el primer niño devuelto al seno del hogar el 20 de marzo de 1998. Ante la objeción de los custodios de facto se esperaría hasta el 24 de marzo de 1998. Se señaló, además, una nueva vista para el 8 de julio 1998.

La señora Alba Viguie Muñoz y señor Charles R. Ruff –custodios de facto del menor M.A.S.- recurrieron al Tribunal de Circuito de Apelaciones solicitando la revisión de la decisión emitida en la vista celebrada el 18 de marzo de 1998 por el Tribunal de Primera Instancia. Mediante sentencia de 21 de mayo de 1998, archivada en autos su notificación el 29 mayo de 1998, el tribunal apelativo ordenó al Tribunal de Primera Instancia celebrar una nueva vista de revisión concediéndole a los custodios de facto plena participación en la misma. Asimismo, ordenó que el

---

un interés genuino en recuperar la custodia de sus hijos, por lo que el Departamento retornó al plan original de regreso de M.A.S. al hogar biológico.

[6] Inconformes éstos con la determinación del tribunal sentenciador recurrieron al Tribunal de Circuito de Apelaciones mediante Petición de Certiorari la cual fue desestimada mediante Resolución de 7 de noviembre de 1997, notificado su archivo en autos el 17 de noviembre de 1998, por prematuro y por el craso incumplimiento con las disposiciones de su reglamento. Caso Núm. KLCE9701086.

[7] La minuta de esta vista fue transcrita el 25 de marzo de 1998. La Resolución se dictó propiamente el 18 de marzo de 1998 aunque fue archivada en autos copia de su notificación el 22 de abril de 1998.

caso le fuera reasignado a otro juez de instancia para la continuación de los procedimientos y que, mientras tanto,

caso le fuera reasignado a otro juez de instancia para la continuación de los procedimientos y que, mientras tanto,

el menor M.A.S. continuara bajo la custodia de los custodios de facto mientras concluía la vista ordenada.

Inconforme con dicha decisión recurre ante nos el Procurador Especial de Relaciones de Familia, a través de la Oficina del Procurador General, formulando los siguientes señalamientos de error:

> "Erró el Tribunal de Circuito de Apelaciones al interpretar que el Artículo 30(g) de la Ley Núm. 75 del 28 de mayo de 1980, según enmendada, faculta a los padres de crianza a participar activamente en un caso en el que se debate la custodia del menor, presentando prueba testifical, documental y pericial.
>
> Erró el Tribunal de Circuito de Apelaciones al ordenar que el caso sea reasignado a otro juez para la continuación de los procedimientos."

Así también, los padres biológicos del menor M.A.S. recurren ante nos mediante Petición de Certiorari. Por su parte, señalan la comisión de los siguientes errores:

> "*Ultra vires* incidió el Tribunal de Circuito de Apelaciones al revocar la entrega del menor M.A.S. a sus padres biológicos, sin vista, violando el debido proceso de ley.
>
> Erró el Tribunal de Circuito al aplicar los criterios del mejor bienestar del menor esbozados en el caso de *Marrero Reyes v. García Ramírez*, 105 D.P.R. 90, al caso de autos.
>
> Incidió el Tribunal de Circuito en su sentencia al dictaminar que el artículo 30 (g) de la ley 75 del mayo [sic] de 1980, que autoriza la intervención de los padres de crianza en los procesos de custodia, patria potestad y adopción, les da el derecho a presentar prueba y confrontar la prueba del Estado sobre la rehabilitación de los padres biológicos. La interpretación de dicho artículo por el tribunal apelativo es inconstitucional y el artículo, en su aplicación, puede ser discriminatorio.
>
> Erró el Tribunal Apelativo al dictaminar que el artículo 30 (g) de la Ley 75 le confiere a los padres de crianza un derecho al debido proceso de ley.
>
> Erró el tribunal de Circuito al destituir la Honorable Jueza del Tribunal de Instancia y reasignar el caso a otro juez."

Examinadas la petición de *certiorari* presentada por el Procurador General y la oposición a la petición de certiorari presentada por los custodios de facto, expedimos mandamiento de *certiorari*, el 30 de junio de 1998. El 5 de agosto de 1998, hicimos lo propio con la petición de *certiorari* presentada por los padres biológicos. Ordenamos la consolidación de ambos recursos acortando a diez (10) días los términos para la presentación de alegatos. Con el beneficio de la comparecencia oportuna de las partes estamos en posición de resolver.

II

De entrada conviene señalar que hemos establecido como parte de nuestra sana política judicial la doctrina de que sólo habremos de declarar la inconstitucionalidad de un estatuto cuando hacerlo resulte indispensable. *Hernández Agosto v. Betancourt*, 118 D.P.R. 79 (1986); *Molina v. C.R.U.V.*, 114 D.P.R. 295 (1983); *P.P.D. v. Admor. Gen. de Elecciones*, 111 D.P.R. 199 (1981); *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980); *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139 (1973); *Mari Bras v. Alcaide,* 100 D.P.R. 506 (1972); *Pueblo ex rel. M.G.G.,* 99 D.P.R. 925 (1971); *Suárez Sánchez v. Tribunal Superior,* 92 D.P.R. 507 (1965); *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958); *Walker v. Tribl. Contribuciones y Tesorero*, 72 D.P.R. 698 (1951); *Spanish Am. Tobacco Co. v. Buscaglia*, 71 D.P.R. 991 (1950); *Tesorero v. Tribl. Contribuciones y* Kemper, 71 D.P.R. 298 (1950); Nitrate Agencies Co. v. *Domenech Tes.,* 44 D.P.R. 515 (1933); *El Pueblo v. García & García,* 22 D.P.R. 817 (1915). Entendemos, por ello, que podemos disponer del asunto ante nos sin entrar a considerar planteamientos de naturaleza constitucional.

Por estar íntimamente relacionados los errores señalados por las partes recurrentes los discutiremos en conjunto.

III

La Ley Núm. 75, *supra*, conocida como la Ley de Protección a Menores, fue aprobada en respuesta a la inquietud de los miembros de la Asamblea Legislativa ante la desgraciada realidad de muchos niños y niñas que eran y son objeto del abuso físico, sexual y emocional de aquellos que vienen obligados moral y legalmente a proveerles atención, amor y los cuidados propios de las distintas etapas de su desarrollo. A tenor con el reconocimiento de la lamentable existencia de maltrato fue que ésta ley entró en vigor a fin de que pudiera convertirse en una herramienta útil para abordar y erradicar tan terrible problema. La Exposición de Motivos del estatuto en cuestión nos señala lo siguiente:

> "Ante esta situación, el Estado Libre Asociado de Puerto Rico, en el ejercicio de su poder de 'Parens Patrie' reconoce su responsabilidad de velar por aquellos niños que son víctimas de maltrato o negligencia para evitar que éstos continúen sufriendo daño, una vez que se sospeche o conozca que son víctimas de las personas que tienen el deber sagrado de velar por ellos; de proveerles los servicios y la ayuda que sea necesaria para fortalecer la familia de donde éstos provienen haciendo del hogar uno seguro para los niños, y cuando esto no sea posible, ofrecerles cuidado fuera del hogar en un ambiente saludable, ya sea en forma provisional o permanente, dependiendo de las circunstancias de cada caso."[8]

El Artículo 3 de la Ley Núm. 75, *supra*,[9] por su parte, declara que es política pública del Estado establecer que su más importante interés consiste en proteger y procurar el bienestar de nuestros menores. Incorpora como parte de esa misma política pública el reconocimiento de que son los padres los llamados a criar a sus hijos. Es decir, se reconoce la autonomía paterna como el vehículo idóneo para criar responsablemente los hijos de esta tierra. Asimismo, incorpora como parte de esa misma política pública el objetivo de preservar la integridad familiar

---

[8] Leyes de Puerto Rico de 1980, págs. 194-195.

[9] 8 L.P.R.A. sec. 403.

fortaleciendo significativamente los lazos familiares. No obstante, establece también que cuando los menores son víctimas de abuso o negligencia se justifica la intervención del Estado a fin de evitar que el daño a ser causado se torne irreparable. Es decir, se establece el mejor bienestar de los menores como la piedra angular de la política pública.[10]

La intervención estatal –cuando necesaria– se hace a través del Departamento de la Familia.[11] El Artículo 5 de la Ley Núm. 75, *supra*,[12] le faculta, entre otras cosas, a adoptar aquéllas reglas, normas o reglamentos necesarios a fin de que se pueda implementar efectivamente la política pública antes señalada.[13]

---

[10] Específicamente la Ley Núm. 8 de 19 de enero de 1995, enmendatoria de la Ley Núm. 75, *supra*, incorporó el siguiente postulado como parte de la referida política pública:

> "Es, asimismo la política pública del Estado establecer, fuera de toda duda, que su interés preeminente es la protección y el bienestar del menor, y que, aún cuando el Estado tiene un deber de proveer servicios sociales de diverso tipo, para prevenir la remoción de los menores de sus hogares y de prestar servicios efectivos de rehabili-tación a los padres, nunca pueden ser utilizados estos legítimos propósitos, por ninguna agencia del Estado Libre Asociado de Puerto Rico, para poner en riesgo de maltrato, abandono o exponer a experiencias nocivas a su desarrollo físico, mental, emocional o moral a ningún menor." Artículo 3 de la Ley Núm. 75, *supra*.

[11] 8 L.P.R.A. sec. 404a.

[12] 8 L.P.R.A. sec. 405.

[13] Hace ya varias décadas, el Departamento adoptó un "Manual de Normas y Procedimientos para el Servicio de Hogares Sustitutos para Menores" con el propósito de regular el funcionamiento de los mismos. Se dispuso que serían éstos los lugares adonde habrían de dirigirse los menores removidos del seno de sus hogares biológicos mientras las agencias concernidas hacen los esfuerzos necesarios por rehabilitar a los padres biológicos de los menores en cuestión. Todo ello en virtud de un contrato entre el Departamento de la Familia y los dueños o

continúa...

[13] continuación

administradores de los hogares sustitutos. Estos hogares sustitutos vienen a hacer las veces de los hogares de los menores. Los miembros de ese hogar sustituto están obligados a ofrecerle a los menores allí ubicados todos los cuidados y atenciones tal como si fueran hijos e hijas propios del hogar. No

Cónsono con el principio de mantener la integridad familiar y proveer para la rehabilitación de los padres biológicos, el Artículo 27 de dicha ley[14] exige que los expedientes e informes relacionados con los casos de protección bajo los incisos de este estatuto sean confidenciales. Con ello se busca proteger el derecho de intimidad de los menores y sus padres o custodios. A renglón seguido, el Artículo 28[15] dispone que "[n]inguna persona, oficial, funcionario, empleado o agencia tendrá acceso a los expedientes a menos que sea para cumplir con los propósitos directamente relacionados con la administración de este Capítulo." Aunque debemos destacar

que dentro del mismo artículo el legislador enumera las personas, que a modo de excepción y sólo con el fin ulterior previamente descrito, podrían tener acceso a este tipo de información confidencial, la premisa fundamental del artículo es limitar el acceso a los expedientes en este tipo de caso. Tanto así que se extendió tal limitación, incluso, a los miembros del tribunal. Por otro lado, el Artículo 33,[16] en su parte pertinente, requiere que el juez al evaluar los casos a la luz de las disposiciones de esta ley lo haga en cámara. A esos fines, sólo se permitirá la comparecencia de las partes con sus respectivos abogados, el juez,

---

podemos, sin embargo, perder de perspectiva el carácter provisional de este tipo de recurso y de que en atención a ese mismo carácter temporero surge la obligación tanto del Estado como de los padres –sustitutos como biológicos– de conservar los vínculos de los menores con éstos últimos. En síntesis, este Manual y el procedimiento en él instituido, no hizo sino recoger los axiomas principales de la Ley para la Protección de Menores, a saber, preservar el bienestar de los menores, proveer para la rehabilitación de los padres biológicos y elaborar el plan de permanencia del menor procurando el eventual regreso de los niños ubicados en hogares sustitutos al hogar de sus padres. Véanse *Pueblo en Interés de los Menores R.P.S., M.P.S. y C.J.N.S.*, Op. de 22 de julio de 1993, 134 D.P.R. ____ (1993), 93 J.T.S. 121; *Hidalgo Marrero v. Depto. de Servicios Sociales*, *supra*.

[14] 8 L.P.R.A. sec. 427.

[15] 8 L.P.R.A. sec. 428.
[16] 8 L.P.R.A. sec. 433.

los funcionarios del tribunal y las personas que discrecionalmente el tribunal entienda que deben estar allí.

En los Estados Unidos, el Congreso federal aprobó en 1980 la ley conocida como la "Adoption Assistance and Child Welfare Act".[17] En *Pueblo de Puerto Rico en interés de los menores R.P.S., M.P.S. y C.J.N.S., supra*, interpretando el alcance de sus disposiciones, concluimos que dicho estatuto aplicaba a Puerto Rico por disposición del Congreso.[18] Dijimos allí que esta medida surgió en respuesta a la triste situación de que una vez removidos los menores de sus hogares debido a actos de maltrato o negligencia eran

reubicados de tiempo en tiempo en diferentes hogares sustitutos. Esta práctica tenía varias consecuencias nocivas: de un lado no se rehabilitaban los lazos familiares y del otro, se le causaba un daño irreparable al menor por no contar con la estabilidad necesaria para desarrollarse adecuadamente. *Pueblo de Puerto Rico en interés de los menores R.P.S., M.P.S. y C.J.N.S.*, *supra*, pág. 11037.

Reconocimos, también, como piedra angular de la ley federal aludida el interés de mantener la integridad de los lazos familiares. A esos fines la ley diseñó un plan de reembolso a través del cual se le devolverían a los estados algunas de las partidas de dinero que invirtieran en la administración de los hogares sustitutos. Sin embargo, para ser acreedores a dichos beneficios la ley requería que las distintas jurisdicciones estatales cumplieran con ciertos requisitos. Entre ellos, que antes de ubicar a un menor en un hogar sustituto el Estado probara

---

[17] Ley Pública 96-272 de 17 de junio de 1980, 42 U.S.C. sec. 620-628, 670-676.

[18] 42 U.S.C. sec. 671 (a) (8).

el hecho de haber realizado esfuerzos razonables para hacer posible el regreso del menor al hogar biológico.[19]

En ocasión de interpretar tal disposición el Tribunal Supremo federal reconoció que el lenguaje del concepto de "esfuerzos razonables" era mandatorio, siendo discrecional sólo la forma en que los estados habrían de implementarlos.[20]

Posteriormente, el 19 de noviembre de 1997 el Congreso aprobó la "Adoption and Safe Families Act of 1997"[21]. Esta nueva legislación, mediante varias enmiendas importantes, reenfocó la política pública según contemplada en la "Adoption Assistance and Child Welfare Act" de 1980.

Responden éstas al interés que tiene el Estado de velar porque los años formativos de los menores sean lo más estables posible. Tal legislación parece responder, también, al hecho de que en ocasiones el término de tiempo a través del cual permanecen los menores removidos de sus hogares biológicos en hogares sustitutos, se extiende por períodos prolongados dejándolos en una especie de "limbo legal".[22] Conscientes de ello al aprobar el estatuto, los legisladores acortaron los términos de los procedimientos según establecidos en el pasado, facilitando así los procedimientos de adopción.

Son varios los cambios que introduce esta nueva legislación. Discutiremos sucintamente algunos de ellos.

---

[19] 42 U.S.C. sec. 671 (a) (3) (15); *Pueblo de Puerto Rico en interés de los menores R.P.S., M.P.S. y C.J.N.S., supra.*

[20] *Sue Suter v. Artist M.*, 503 U.S. 347 (1992); ver *Pueblo en interés de los menores R.P.S., M.P.S. y C.J.N.S., supra.*

[21] Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat.2115.

[22] Kathleen A. Bailie, The Other "Neglected" Parties in Child Protective Proceedings: Parents in Poverty and the Role of the Lawyers Who Represent Them, Vol. 66 Fordham L.R. Number 6, 1998, pág.2291-2292.

Entre los más significativos, el reconocimiento categórico de que el mejor bienestar de los menores -su salud y seguridad- habrá de ser el principio más importante al cumplir con el requisito de "esfuerzos razonables" según contemplado en la ley[23].

A esos efectos, el Congreso clarificó el requisito de "esfuerzos razonables". Dispuso, en primer lugar, que al cumplir con este requisito, el Estado debía tener como norte el mejor bienestar del menor. A renglón seguido, mantuvo el requisito de que los estados realizaran esfuerzos razonables por reunificar a los padres biológicos con sus hijos -removidos de sus hogares y ubicados en hogares sustitutos, excepto cuando el padre o la madre ha sometido al menor a circunstancias agravadas, -según definidas por los estados. El propio Congreso sugiere, sin pretender ser exhaustivo, el abandono, la tortura, el abuso crónico y abuso sexual como algunas de esas circunstancias.[24] Es decir, con el nuevo reenfoque, el Congreso mantiene el requisito de "esfuerzos razonables", pero su cumplimiento debe ceder ante la ocurrencia de situaciones graves que tengan el efecto de atentar contra la salud y seguridad de los menores.

Por otro lado, algunas de las disposiciones de esta ley acortan los términos, proveyendo como corolario, que los niños ubicados en hogares sustitutos por períodos prolongados de tiempo sean adoptados con mayor celeridad. Entre los efectos más significativos de la ley se encuentra la reducción en el lapso de tiempo en el cual los menores pueden estar en hogares sustitutos sin que se celebre la vista de permanencia ("permanency hearing").[25] Así, pues, los dieciocho (18) meses que contemplaba la

---

[23] Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, sec. 101 (a) (A).

[24] Adoption and Safe Families Act of 1997, Pub. L. No.105-89 sec. 101 (a) (D) (i), 111 Stat. 2115, 2116 .

[25] La "permanency hearing" forma parte de las vistas de revisión y representa la fecha límite para decidir finalmente el curso de acción a seguirse en el caso. Véase, Donald Duquette, et

ley originalmente ahora estarían reducidos a doce (12).[26] Surge, también, el imperativo de que los estados inicien el proceso para finalizar los derechos de los padres biológicos sobre aquellos de sus hijos que hayan estado ubicados en hogares sustitutos, quince (15) de los últimos veintidós (22) meses.[27]

Finalmente, se reconoce el derecho de los custodios de facto a ser notificados y escuchados en los procedimientos de revisión o vistas, cuando las mismas están relacionadas con los niños ubicados bajo su cuidado. Sin embargo, el reconocimiento de éstos derechos no debe interpretarse como que los custodios de facto se convierten en parte.[28]

Para una discusión más detallada de los efectos de la nueva legislación sobre las familias a las cuales les han sido removidos sus hijos por actos de negligencia, véase, Donald Duquette, et. al, loc. cit., nota 25.

Nótese que aún con los cambios que la "Adoption and Safe Families Act of 1997" incorpora, no se desvirtúa la esencia del requisito de que el Estado debe realizar esfuerzos razonables por

---

al., We Know Better Than We Do: A Policy Framework for Child Welfare Reform, 31 U. Mich. J. L., Ref. 93.

[26] Adoption and safe Families Act of 1997, Pub. L. No. 105-89, sec. 302 (2).

[27] Adoption and safe Families Act of 1997, Pub. L. No. 105-89, sec. 103 (a) (3) (E).

[28] En palabras de la propia ley se dispone que:
continúa...

[28]...continuación

> "the foster parents (if any) of a child and any preadoptive parent or relative providing care for the child are provided with notice of, and an opportunity to be heard in, any review or hearing to be held with respect to the child, except that this subparagraph shall not be construed to require that any foster parent, preadoptive parent, or relative providing care for the child be made a party to such a review or hearing solely on the basis of such notice and opportunity to be heard." Adoption and Safe Families Act, Pub. L. No. 105-89, sec. 104 (G).

devolverle a los padres biológicos el cuido y custodia de los hijos que fueron removidos temporeramente del seno familiar. Exime al Estado del cumplimiento de tal requisito cuando circunstancias apremiantes así lo aconsejen. Ciertamente, su aplicación no es incompatible con lo dispuesto por nuestro legislador. Entendemos armonizables ambos estatutos.

Adviértase que dichas legislaciones, tanto la federal como la estatal, tienen como denominador común, además del mejor bienestar de los menores, el interés por fortalecer los vínculos familiares entre los padres biológicos y sus hijos. Teniendo el beneficio y la certeza de que existen estas leyes con el ya descrito propósito fundamental, no podemos hacer la determinación de custodia únicamente a base de los criterios que establecimos en *Marrero Reyes v. García Ramírez*, *supra*, sin tomar en consideración los principios recogidos tanto en la ley federal como en la estatal sobre protección a menores. En *Marrero Reyes v. García Ramírez, supra*, tratábase de una pugna por la custodia de una menor entre la madre contra los abuelos maternos y el padre, a diferencia del caso de autos, en que la controversia surge al amparo de la Ley Núm. 75, *supra*, según enmendada.[29]

Sin embargo, aunque se distinguen los hechos de aquel caso con los de autos, es propio que en aras de ejercer su discreción y como guías mínimas que le auxilien en la delicada tarea de decidir si unos menores deben ser permanentemente removidos de la custodia de sus padres biológicos, los jueces de instancia pueden utilizar

---

[29] En ese caso tuvimos ocasión de establecer una serie de criterios -sin ser exhaustivos- que deben evaluarse por el tribunal de instancia al adjudicar la custodia de un menor. Entre ellos están "la preferencia del menor; su sexo; edad y salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela, y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud psíquica de todas las partes." (citas omitidas). *Marrero Reyes v. García Ramírez*, *supra*, pág. 105.

los criterios de *Marrero Reyes v. García Ramírez*. Así también, podrán tomar en consideración factores adicionales como: el plan de servicios y si se ha cumplido efectivamente con él; cuál ha sido el rol de los custodios de facto; las relaciones entre el menor y sus padres biológicos; si existe un procedimiento paralelo en el cual los custodios de facto requieran adoptar el menor convenido, entre otros.

Por otra parte, desde su aprobación en 1980, la Ley Núm. 75, *supra*, ha sufrido varias enmiendas. Entre ellas están las contempladas en la Ley Núm. 8, *supra*.[30]

Además de enmendar los incisos (c), (e) y (f) del Artículo 30 de la Ley Núm. 75, *supra*, la Ley Núm. 8 de 19 de enero de 1995 incluyó un nuevo inciso (g).

El Artículo 30, sin pretender ser exhaustivo, provee las alternativas que el tribunal considerará, una vez hecha la determinación de maltrato o negligencia. En su parte pertinente dispone lo siguiente:

> "[e]l tribunal, una vez hecha la determinación de maltrato o negligencia, resolverá a base de los mejores intereses y bienestar del menor y podrá tomar sin que se entienda como una limitación, una o más de las siguientes determinaciones:
>
> (a) Mantener al menor en su hogar natural con la supervisión protectora del Departamento y bajo las condiciones que el tribunal estime convenientes por un lapso de tiempo que, inicialmente, no será mayor de tres (3) meses, prorrogables hasta un período máximo de seis (6) meses.
>
> (b) Mantener a la persona o personas bajo supervisión protectora sujetas a presentarse al tribunal en cualquier momento durante el período de supervisión protectora en caso que ocurra un daño al menor o exista riesgo sustancial de daño al menor.
>
> (c) Privar a los padres o a la persona responsable del menor de la custodia en forma provisional, por un lapso de tiempo que inicialmente no será mayor de tres (3) meses, prorrogable hasta un término máximo de seis (6) meses, señalándole a los padres y al Departamento las medidas que deberán tomarse para que el menor

---

[30] Leyes de Puerto Rico de 1995, pág. 46-59.

pueda regresar a su hogar en el plazo más breve, de ser esto posible sin poner en riesgo al menor; o podrá tomar las providencias que sean necesarias para una determinación final sobre la custodia del menor.

(d) Otorgar la custodia legal del menor al Departamento. En todo caso de protección en que el Tribunal conceda la custodia legal del menor al Departamento, éste estará facultado para autorizar cualquier tratamiento médico y/o intervención quirúrgica que el menor necesite. Así como para autorizar la realización de cualquier acto que sea para beneficio del menor como, por ejemplo, conceder permiso para que éste salga de Puerto Rico de vacaciones o permiso para participar en actividades deportivas y recreativas. En estos casos y antes de dar su autorización, el Departamento hará gestiones razonables para conseguir a los padres o tutores a los fines de que éstos autoricen el tratamiento o la actividad de que se trate, a menos que por circunstancias especiales la demora en conseguir a los padres o la negativa injustificada de éstos resulte en detrimento del menor. Cuando la custodia legal le fuere otorgada al Departamento, la custodia de facto podrá recaer en la persona que el Departamento a tales efectos designe. El custodio de facto tendrá, respecto del menor de que se trate, los siguientes derechos y obligaciones:

(1) Mantener la custodia física del menor.
(2) Proteger, educar y disciplinar al menor.
(3) Proveer alimento, ropa, albergue, educación acadé-mica, recreación y el cuidado médico rutinario requerido por el menor.
(4) Autorizar cualquier trata-miento médico de emergencia, incluyendo cualquier inter-vención quirúrgica que no admita la demora que conlleva el conseguir la correspon-diente autorización de los padres o del Secretario del Departamento.

(e) Otorgar la custodia del menor a un familiar o a otra persona que el tribunal estime conveniente. Cuando se trate de una persona jurídica, ésta deberá poseer una licencia del Departamento para estos fines.

(f) Cualquier otra determinación necesaria para la protección de los mejores intereses del menor incluyendo la privación de la patria potestad a ambos padres conjuntamente, por separado, o a uno sólo en aquellos casos en que se pruebe una de las causales de la sec. 634a del Título 31 o esté presente una de las circunstancias descritas en la sec. 634b del mismo título.

> (g)Cualquier persona a quien se le encomiende, por el tribunal o el Departamento, la custodia de facto de un menor <u>podrá comparecer y presentar su posición y alegaciones</u>, en cualquier caso en que se ventile la patria potestad, custodia o adopción del menor a su cargo." (Enfasis suplido) 8 L.P.R.A. sec. 430.

De entrada, debemos recordar el principio establecido en nuestra jurisdicción de que cuando "la ley es clara y libre de toda ambigüedad no debemos menospreciar su letra con el pretexto de cumplir su espíritu." Artículo 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14; *Román v. Superintendente de la Policía*, 93 D.P.R. 685, 686 (1966).

Una lectura del inciso (g) nos revela el propósito del legislador de facultar a los jueces de los tribunales de instancia a permitir la comparecencia de los custodios de facto cuando éstos lo soliciten.

Así también, el Informe de la Comisión de lo Jurídico del Senado sobre el P. de la C. 1607 nos ilustra sobre el particular. En este se avala la inclusión del inciso (g) del Artículo 30 de la Ley Núm. 75, *supra*. Entendían los miembros de la Comisión que dicha enmienda legitimaba activamente la participación de los custodios de facto –fueran personas naturales o jurídicas– en los procedimientos de privación de patria potestad, custodia y adopción. Fundamentalmente porque son ellos las personas que en ocasiones proveen para la rehabilitación de niños que en el pasado fueron abusados, maltratados o abandonados.

No obstante, del mismo informe surge la preocupación de que las enmiendas entonces propuestas a la Ley de Protección a Menores debían conformarse a los postulados de la ley federal y de la ley estatal.[31]

Los custodios de facto tienen derecho a presentar su posición y alegaciones sobre la patria potestad y custodia de los menores,

o sobre la adopción si éste fuese el caso pendiente.  No obstante, el tribunal de instancia no está obligado a admitirlos como parte interventora en los procedimientos con todos los derechos que le asisten a una parte.  En un procedimiento de privación de patria potestad y custodia como el de autos, las partes son el menor, representado por el Procurador de Relaciones de Familia, el

---

[31] Véase el Informe de la Comisión de lo Jurídico sobre el P. de la C. 1607, págs. 15-16.

Departamento de la Familia y los padres biológicos. Hay que recordar que en el caso de autos fue el Departamento el que recibió la custodia provisional del menor, mientras los padres biológicos cumplían con el plan de servicios y lograban su rehabilitación; el Departamento designó provisionalmente a los esposos Viguie Muñoz y Ruff como custodios de facto. Ello no los convierte en "partes" en el procedimiento.

Sin embargo, pudiera haber instancias donde los custodios de facto han cuidado éstos niños por espacios de tiempo prolongados o han sido instrumentales en la rehabilitación de menores física, sexual o mentalmente abusados, en cuyo caso le reconocemos al tribunal de primera instancia discreción para permitir la participación de los custodios de facto en una forma más activa. A esos fines el tribunal evaluará y determinará si éstos poseen información que de otro modo no pueda estar accesible al tribunal y que al no ser considerada pueda redundar en un fracaso de la justicia. A modo ilustrativo, podría ser información relacionada con el comportamiento del menor en el hogar sustituto; problemas de adaptación; problemas físicos y/o mentales, si alguno; la relación con sus padres biológicos; la forma de éstos relacionarse con aquél y aún cualquier otro elemento que ponga al tribunal en condiciones de hacer una determinación que contribuya al mejor bienestar del menor. Los jueces estarán aconsejados, siempre, en tan delicado análisis por el mejor bienestar de nuestros niños. No obstante, no fue esa la situación en el caso de autos.

Aún cuando los custodios de facto tienen derecho, si así lo solicitan, a presentar su posición y alegaciones, no podemos endosar la interpretación tan amplia y absoluta que hizo el Tribunal de Circuito de Apelaciones al interpretar el inciso (g) del Artículo 30 de la Ley núm. 75, *supra*. El foro apelativo no sólo le reconoció a los custodios de facto el derecho a participar en los procedimientos de custodia y patria potestad,

sino que interpretó que esa participación sería como parte interventora. A esos efectos dispuso lo siguiente:

> "En el caso de autos, los interventores alegaron una serie de irregularidades en los procedimientos y cuestionaron la rehabi-litación de los padres de M.A.S. No obstante, el Tribunal de Instancia no les permitió presentar prueba que sostuviera sus alegaciones ni confrontar la prueba del Estado sobre la alegada rehabilitación. Al así actuar, no sólo se puede estar poniendo en peligro la seguridad del menor, sino que se violentó el derecho que tienen los interventores a un debido proceso de ley, en el ejercicio del derecho conferido por el citado Artículo 30 (g) de la Ley 75." Sentencia del Tribunal de Circuito de Apelaciones, pág.8.

Son varios los criterios que nos llevan a rechazar la interpretación hecha por el tribunal apelativo. En primer lugar, nuestra Ley de Protección a Menores y todo el andamiaje teórico y práctico que se ha construido alrededor de ella, además de velar por el bienestar de los menores, propende a la rehabilitación de los padres biológicos con el objetivo de que sean ellos los llamados a cuidar, velar, proteger y educar a sus hijos. En *Santosky v. Kramer*, 455 U.S. 745, 753 (1981), el Tribunal Supremo federal, interpretando principios incorporados en la ley federal, aplicable a Puerto Rico según discutimos anteriormente, expresó lo siguiente:

> "The absence of dispute reflected this Court's historical recognition that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. (citas omitidas)The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life[...]".

Pertinente resulta también la decisión de *Smith v. Organization of Foster Families,* 431 U.S. 816 (1977). La controversia medular en este caso era determinar si los custodios

de facto tenían un interés libertario, protegido por la Enmienda Décimocuarta de la Constitución federal, a mantener la integridad de su familia de crianza.

En un esfuerzo evidente por tratar de ponderar las particularidades de este tipo de procedimientos *vis a vis* los derechos y sentimientos de las partes envueltas, el Tribunal Supremo federal soslaya el planteamiento constitucional y concluye que los procedimientos estatuidos por el estado de New York para escuchar a los custodios de facto, cuando se remueven a los menores ubicados en los hogares sustitutos, eran adecuados para proteger cualquier tipo de interés propietario que aquéllos pudieran tener.

Antes de llegar a tal conclusión, el tribunal reitera, entre otras cosas, que:

> "[b]ut as we have already held, whatever liberty interest may be argued to exist in the foster family is significantly weaker in the case of removals preceding return to the natural parent, and the balance of due process interests must accordingly be different." *Smith v. Organization of Faster Families, supra*, pág. 853.

A la luz de esto, debemos puntualizar que aceptar la participación de los custodios de facto como partes interventoras en los casos de patria potestad y custodia bajo la Ley Núm. 75, en la forma tan amplia y absoluta como autorizó el Tribunal de Circuito de Apelaciones en el caso de autos, troncharía el objetivo de nuestra ley y vulneraría el derecho constitucional que tienen los padres a criar a sus hijos aún cuando esos padres no tengan todas las herramientas que otros que pretenden sustituirlos pudieran tener. Es en parte responsabilidad de todos contribuir a que los padres y las madres que se han visto en la triste realidad de ser privados temporeramente de la custodia de sus hijos, puedan tener las herramientas mínimas para reeducarse y descargar efectivamente tan grande responsabilidad.

Además, acoger el razonamiento del tribunal apelativo daría al traste con la confidencialidad de los procedimientos, aparte de que constituiría una invasión adicional e injustificada a la intimidad de los padres biológicos.

Aunque cierto es que el derecho a la intimidad de los padres biológicos cede en virtud del interés apremiante del Estado en preservar la integridad y salud física y mental de nuestros menores, no es menos cierto tampoco, que tenemos que velar por que dicho interés apremiante no se convierta en el arma que hiera mortalmente la dignidad e intimidad de esos padres. Es decir, el Estado no puede ser más invasivo de lo necesario y razonable. Véase *Santosky v. Kramer*, *supra*; *Mathew v. Eldridge*, 424 U.S. 319 (1976) y *Grisswold v. Connecticut*, 381 U.S. 479 (1965). Nótese que a pesar de las enmiendas sufridas por la Ley Núm. 75, *supra*, el legislador mantuvo la integridad del principio de confidencialidad de los procedimientos bajo este estatuto.

No podemos olvidar que las partes en este caso son los padres biológicos y el Estado. Interpretar que los custodios de facto pueden intervenir en estos casos, tal como si fueran una parte indispensable, soslayaría los propósitos que guiaron la aprobación de las leyes en cuestión y convertiría las salas de nuestros tribunales en cuadriláteros de pelea entre los padres biológicos y los custodios de facto.

Finalmente, refrendar lo resuelto por el Tribunal de Circuito de Apelaciones equivaldría a reconocer veladamente que los intereses de los menores no están adecuadamente representados en el caso. Nada más lejos de la verdad.

La naturaleza confidencial de los procedimientos no limita la participación del Procurador de Relaciones de Familia. Este funcionario del Estado es el defensor judicial de los menores en este tipo de procedimientos. Siendo ello así, se le ha impuesto

el deber de ser instrumental en el proceso y facilitarle al tribunal la tarea de lograr el mejor bienestar del menor, por lo que el interés de éstos está adecuadamente representado y protegido.

Así, tampoco, se limita la participación de los profesionales de la conducta humana, de los representantes legales del Departamento de la Familia –agencia gubernamental encargada de implementar la Ley Núm. 75– y más aún del tribunal –árbitro imparcial de las controversias judiciales. Las determinaciones de nuestros jueces de instancia deben estar, y de ordinario así lo son, fundamentadas en la evidencia que se presente en la vista. Incluyendo, entre otros, el testimonio de los padres biológicos, el testimonio e informes de los psicólogos, psiquiatras, técnicos de servicios sociales, trabajadores sociales, así como el testimonio y alegaciones que ofrezcan los custodios de facto. Con esto queremos enfatizar que al momento de hacer una determinación de esta magnitud – si unos menores son removidos permanentemente de la custodia de sus padres biológicos – los tribunales de Puerto Rico actuarán inteligente y responsablemente, a base de la totalidad de la prueba desfilada y las circunstancias específicas de cada caso.

En síntesis, el Artículo 30 (g) de la Ley Núm. 75, *supra*, requiere que el tribunal de instancia escuche la posición y alegaciones de los custodios de facto. Sin embargo, esa participación no confiere el derecho a intervenir formalmente como parte en los procedimientos con derecho a ofrecer prueba, a contrainterrogar testigos y rebatir la prueba de las partes en todos los procedimientos bajo la Ley Núm. 75, *supra*.

IV

Nos resta decidir si actuó correctamente el Tribunal de Circuito de Apelaciones al reasignar el caso de autos a otro juez del Tribunal de Primera Instancia.  Entendemos que no. Veamos.

El procedimiento de inhibición de los jueces está regulado por las Reglas 63.1, 63.2 y 63.3 de Procedimiento Civil.[32]

La Regla 63.1, *supra*, establece que la inhibición o recusación de un juez puede ocurrir por iniciativa propia o a petición de alguna de las partes. De igual forma dispone las instancias en las cuales los jueces se ven obligados a inhibirse. Entre ellas, cuando el juez tenga algún interés en el resultado del caso o demuestre prejuicio o parcialidad hacia cualquiera de las partes; cuando exista parentesco de consanguinidad o afinidad entre el juez y cualquiera de las partes o sus representantes legales dentro del cuarto grado; por haber el juez fungido como abogado de cualquiera de las partes o sus abogados o haber actuado como fiscal en los mismos hechos que en ese momento dan base a la reclamación pendiente ante él; por existir entre el juez y las partes o sus abogados una amistad de tal naturaleza que pueda frustrarse la justicia del caso; o cualquiera otra situación que pueda contribuir a minar la fe y confianza que el pueblo tiene en nuestro sistema de justicia.[33] La petición de recusación se debe

---

[32] 32 L.P.R.A. Ap. III, Reglas 63.1, 63.2 y 63.3.

[33] Por su parte, el Canon XII de Etica Judicial, 4 L.P.R.A. Ap. IV-A dispone lo siguiente:

> "El juez no debe entender en procedimiento judicial alguno en que la ley le prohiba actuar, incluyendo, pero sin limitarse a cualesquiera de los casos siguientes:
>
> a) Por tener prejuicio o parcialidad hacia cualesquiera de las personas o abogados que intervengan en el pleito o por haber prejuzgado el caso.
>
> b) Por estar directa o indirectamente interesado en el resultado del caso.
>
> c) Por haber sido abogado o asesor de cualesquiera de las partes o de sus abogados en la materia en controversia, o

presentar tan pronto la parte que la solicita adviene en conocimiento de los hechos que justifican tal proceder. Esta debe contener una relación de esos hechos y tiene que ser jurada.[34] Una vez presentada y notificada se referirá a la consideración de otro juez.[35]

En *Ayala v. Maryland Casualty Co.*, 47 D.P.R. 345, 355-356 (1934) establecimos hace ya décadas que la solicitud de inhibición de un juez debe hacerse en las etapas tempranas de los

---

fiscal en una in-vestigación o procedimiento crimi-nal en el que los hechos fueron los mismos presentes en el caso ante su consideración.

d) Por haber presidido el juicio del mismo caso en un tribunal inferior o por haber actuado como magis-trado a los fines de expedir la orden de arresto o citación para

continúa...

[33] continuación...

determinar causa probable en la vista preliminar de un procedimiento criminal.

e) Por existir parentesco de consanguinidad o afinidad dentro del cuarto grado con el acusado, con la víctima del delito, con el abogado defensor o el fiscal o con un miembro del jurado en un procedimiento criminal, o con cualesquiera de las partes o sus abogados en un procedimiento civil.

f) Por intervenir en el procedimiento ante él una persona natural que le haya facilitado o gestionado algún préstamo, o una persona jurídica que le haya facilitado o gestionado algún préstamo en el que no se hayan dispensado las garantías o condiciones usuales.

g) Por cualquier otra causa que pueda razonablemente arrojar dudas sobre su imparcialidad para adjudicar o que tienda a minar la confianza pública en el sistema de justicia.

El juez deberá inhibirse tan pronto conozca de la causa de inhibición mediante resolución escrita en la que hará constar dicha causa, con notificación de la misma a todas las partes."

[34] 32 L.P.R.A. Ap. III, Regla 63.2 de Procedimiento Civil.

procedimientos y no cuando se solicita revisar sus méritos en la fase apelativa. Razonamos allí que permitir este tipo de planteamiento en una etapa tan avanzada del procedimiento, como ciertamente lo es la apelativa, tendría el efecto de colocar a la parte que lo solicita en una posición privilegiada ya que bien podría aprovecharse en caso de que el fallo le beneficiara u objetarlo en caso de que le fuera desfavorable.

Recientemente, en *Departamento de la Familia v. Shrivers Otero*, Opinión de 17 de abril de 1998, 145 D.P.R. ___ (1998), 98 J.T.S. 46, delimitando las funciones y obligaciones del Tribunal de Circuito de Apelaciones dijimos:

> "Respecto al alcance de su función, es preciso señalar que el Tribunal de Circuito tiene que determinar si el foro sentenciador basó su decisión en una interpretación correcta del derecho positivo y si condujo adecuadamente los procedimientos, de suerte que no se le haya causado perjuicio a las partes. Además debe determinar si el foro sentenciador llegó a conclusiones que están apoyadas en la evidencia presentada en el caso. No debe considerar una controversia que no fue levantada en el tribunal de instancia a menos que sea necesario para evitar una injusticia manifiesta.(Citas omitidas). *Departamento de la Familia v. Shrivers Otero*, *supra,* pág. 832.

En el caso de autos, sin mediar una solicitud de inhibición, el Tribunal de Circuito de Apelaciones ordenó la celebración de una nueva vista ante un juez distinto. El foro apelativo al elaborar la relación de hechos justifica su proceder en la relación de hechos que, a su vez, elaboraron los custodios de facto al presentarles su "Solicitud de Certiorari". Los custodios *de facto* alegaban que al momento de considerar su intervención la juez de instancia la denegó por ser académica toda vez que ya no iban a privar de la patria potestad a los padres biológicos. Resolvió además que "así se lo dictaban su conciencia y su

---

[35] 32 L.P.R.A. Ap. III, Regla 63.3 de Procedimiento Civil.

corazón".[36] Así las cosas, en la parte dispositiva de la sentencia el tribunal apelativo dispuso que "en vista de las expresiones realizadas por la sala recurrida, se ordenaba la reasignación a otro juez para la continuación de los procedimientos.[37]

El estudio de los autos nos revela que no existe una solicitud de inhibición ni las correlativas garantías que ofrece nuestro ordenamiento procesal para este tipo de situación. Asimismo, al evaluar la sentencia notamos que está huérfana de los fundamentos jurídicos que llevaron al foro apelativo a destituir de facto a un juez de primera instancia. Con su proceder el Tribunal de Circuito de Apelaciones no sólo actuó *ultra vires*, sino que al despachar un asunto tan livianamente no nos puso en condiciones de evaluar su determinación apropiadamente.

Por ende, concluimos que erró el Tribunal de Circuito de Apelaciones al reasignarle el caso a otro juez de instancia sin que mediara una solicitud a esos efectos y sin que de los autos se justificara tal medida.

Por los fundamentos expuestos procede revocar la sentencia del Tribunal de Circuito de Apelaciones de 21 de mayo de 1998. Devolvemos la consideración de este asunto al Tribunal de Primera Instancia para que celebre una nueva vista, que podrá ser en cámara, a fin de escuchar la posición y alegaciones de los custodios de facto de M.A.S.; así como cualquier evidencia pertinente que someta el Procurador de Relaciones de Familia, el Departamento de la Familia y los padres biológicos, a los fines de determinar lo que en derecho proceda sobre la patria potestad y custodia del menor M.A.S.

Se dictará sentencia de conformidad.

---

[36] Véase el Apéndice de la Petición de Certiorari del Procurador de Relaciones de Familia, representado por el Procurador General cc-98-529, pág. 9.

[37] Sentencia del Tribunal de Circuito de Apelaciones, pág. 10.

BALTASAR CORRADA DEL RÍO
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

DEPARTAMENTO DE LA FAMILIA
      Demandante
            v.
CÁNDIDA R. SOTO Y MANUEL
AYALA PÉREZ
      Demandado

                                    CC-98-529        Certiorari
ALBA VIGUIE MUÑOZ, CHARLES R.        CC-98-549
RUFF                                    Cons.
      Recurridos
            v.
PROCURADOR ESPECIAL DE
RELACIONES DE FAMILIA
      Peticionario

SENTENCIA

San Juan, Puerto Rico, a 2 de marzo de 1999.

      Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por el Tribunal de Circuito de Apelaciones de 21 de mayo de 1998 y se devuelve el caso al Tribunal de Primera Instancia para que celebre una nueva vista, que podrá ser en cámara, a fin de escuchar la posición y alegaciones de los custodios de facto de M.A.S.; así como cualquier evidencia pertinente que someta el Procurador de Relaciones de Familia, el Departamento de la Familia y los padres biológicos, a los fines de determinar lo que en derecho proceda sobre la patria potestad y custodia del menor M.A.S.

      Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri disiente con opinión escrita a la cual se unen el Juez Asociado señor Negrón García y la Juez Asociada señora Naveira de Rodón.

                              Isabel Llompart Zeno
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

```
                                    *
Departamento de la Familia          *
     Demandante                     *
                                    *
          vs.                       *              CC-98-529
                                    *         Cons. CC-98-549
Cándida R. Soto y Manuel Ayala      *
Pérez                               *
     Demandados                     *
                                    *
          vs.                       *              Certiorari
                                    *
Alba Viguie Muñoz, Charles R.       *
Ruff                                *
     Recurridos                     *
                                    *
          vs.                       *
                                    *
Procurador Especial de Relaciones   *
De Familia                          *
     Peticionario                   *
                                    *
* * * * * * * * * * * * * * * * * **
```

Opinión disidente emitida por el Juez Asociado señor FUSTER BERLINGERI a la cual se unen el Juez Asociado señor NEGRON GARCIA y la Juez Asociada señora NAVEIRA DE RODON.


San Juan, Puerto Rico, a 2 de marzo de 1999.


La cuestión medular que tenemos ante nos en el caso de autos se refiere al alcance de lo dispuesto en el Artículo 30(g)(bis) de la Ley Núm. 75 de 28 de mayo de 1980, 8 L.P.R.A. sec. 430(g)(bis), Ley de Protección de Menores. Dicha disposición provee para que, en casos en los cuales se ventile la patria potestad, la custodia o la adopción de un menor de edad, la persona quien ha tenido a su cargo la custodia de facto de ese menor, pueda "**comparecer y presentar su posición y alegaciones**" sobre el particular ante el foro de instancia. Nos toca interpretar qué grado de participación pueden tener dichos custodios de facto en los procedimientos referidos.

La mayoría del Tribunal resuelve la cuestión aludida, limitando la participación de tales custodios de facto en cualquier caso a que el foro de instancia "**los escuche**", pero negándole a éstos concretamente la posibilidad de: (1) ofrecer prueba; (2)

contrainterrogar testigos; y, (3) rebatir la prueba de las partes en dichos procedimientos. Expresamente resuelve la mayoría que los custodios de facto como tal nunca tienen derecho a intervenir como parte en los procedimientos en cuestión.

Me parece muy desacertada la pauta decretada por la mayoría del Tribunal respecto al asunto en cuestión. Se trata de una interpretación en exceso restrictiva de lo dispuesto en el referido Artículo 30(g)(bis). No sólo impone una camisa de fuerza a los custodios de facto, que en notables ocasiones puede resultar en detrimento del menor, sino que además, no corresponde a los eminentes criterios procesales que rigen en nuestro ordenamiento jurídico. Veamos.

I

Para comenzar, el propio tenor del Artículo 30(g)(bis) referido intima un derecho de los custodios de facto a una participación adecuada en los procedimientos judiciales en cuestión. Se les reconoce el derecho a **"comparecer... y presentar sus alegaciones"**. Se trata de términos técnicos, que en derecho se refieren precisamente a lo que hacen las **partes** en un procedimiento judicial. Véase, Regla 15 de Procedimiento Civil de Puerto Rico, 32 L.P.R.A. Ap. III, R.15. Véase, además, Agudo Cano v. Tribunal Superior, 95 D.P.R. 892 (1968); Aybar v. Vara, 54 D.P.R. 162 (1939); Gutiérrez v. Ramos, 45 D.P.R. 869 (1933); Gómez v. Jta. Exam., 40 D.P.R. 662 (1930); y, Mora v. Rivera, 25 D.P.R. 493 (1917). Más aun, es difícil comprender qué sentido puede tener que a una persona se le reconozca el derecho a comparecer judicialmente, y a presentar su posición y sus alegaciones, sin que ello apareje a la vez el derecho a demostrar la veracidad de la posición aducida y la validez de las alegaciones formuladas. Es bien sabido que en nuestro ordenamiento procesal, las alegaciones sólo tienen el propósito de bosquejar a grandes rasgos la reclamación de una parte en una contienda judicial, y que la parte que las formula

tiene el deber subsiguiente de sustanciar con prueba la validez de sus alegaciones. El Vocero v. Jta. de Planificación, 121 D.P.R. 115 (1988); Sierra v. Trbl. Superior, 81 D.P.R. 554 (1959). El derecho a formular alegaciones, sin el correspondiente derecho a sustanciarlas con prueba, es evidentemente **hueco**, y en nada promueve la finalidad cardinal de todo procedimiento judicial, que es la de descubrir la verdad de los hechos. Pueblo v. Ríos Nogueras, 111 D.P.R. 647 (1981); J.R.T. v. Autoridad de Comunicaciones, 110 D.P.R. 879 (1981). Desde el punto de vista estrictamente procesal, pues, no puede ser que a los custodios de facto sólo se les haya concedido por ley el trunco derecho de esbozar meras alegaciones. En correcta juricidad, el derecho a probar las alegaciones formuladas es consustancial con el derecho a presentarlas. El concepto de "**presentar**" su posición y sus alegaciones según usado en el Artículo 30(g)(bis) referido, debe entenderse en su acepción que significa "mostrar", es decir, **hacerla patente**, darla a conocer y "**convencer de su certidumbre**". (Diccionario de la Lengua Española, Espasa-Calpe, Vigésima Edición).

## II

Adentrándonos en los méritos substantivos del asunto ante nos, debe notarse que existen muy buenas razones para concederle a los custodios de facto una participación adecuada en los procedimientos referidos. Como se sabe, el interés preeminente que se busca proteger mediante los procedimientos en cuestión es el logro del máximo bienestar del menor. Marrero Reyes v. García Ramírez, 105 D.P.R. 90 (1976); Castro v. Meléndez, 82 D.P.R. 573 (1961); Rodríguez v. Gerena, 75 D.P.R. 900 (1954). Todo el entramado procesal de la Ley de Protección de Menores va dirigido a procurar la decisión que mejor favorezca al menor. 8 L.P.R.A. sec. 403.

Resulta, sin embargo, que las determinaciones judiciales referentes a cosas tales como la custodia, la patria potestad o la adopción de menores **no son siempre fáciles de hacer**. Según hemos

señalado reiteradamente, tales determinaciones requieren la cuidadosa ponderación de numerosos factores delicados y sutiles. Nudelman v. Ferrer Bolivar, 107 D.P.R. 495 (1978); Marrero Reyes v. García Ramírez, supra. Con gran frecuencia requieren, además, poner elementos conflictivos en fino balance: reclamos encontrados de los padres, o de éstos frente al Estado, o de unos y otros frente a terceros que también tienen intereses legítimos en el asunto. Las difíciles decisiones judiciales muchas veces tienen que tomarse de cara a las opiniones antagónicas de los peritos y testigos de partes contrarias. Se trata, como hemos reconocido antes, de un **"asunto de tan extrema dificultad"**. Marrero Reyes v. García Ramírez, supra, a la pág. 106.

El logro de la solución más justa en el angustioso proceso aludido exige contar con el mayor caudal informativo disponible. En lo posible, **deben traerse a colación todos los datos, prueba y puntos de vista que sean pertinentes**. Sólo así se pueden evaluar y sopesar adecuadamente los diversos y complejos factores que nuestra jurisprudencia ordena que deben analizarse en estos asuntos.

A la luz de lo anterior, es evidente que en muchas ocasiones son de gran valor los criterios y los conocimientos sobre los menores que puedan aportar sus custodios de facto. Según reconoce la propia mayoría en su opinión, en muchas instancias son los custodios de facto los que han estado a cargo de los menores por espacios de tiempo prolongados, atendiéndolos y procurando su rehabilitación cuando éstos han sido abandonados, maltratados o abusados. **Incluso en ocasiones, los custodios de facto han tenido a los menores en sus hogares de crianza por mayor tiempo que los propios padres biológicos**, como sucedió en el caso de autos respecto a M.A.S., quien vivió con su madre biológica **por sólo cuatro meses a partir de su nacimiento y entonces vivió por varios años corridos con su padres de crianza**, que son los custodios de facto en el caso de autos. No es sorprendente que en situaciones como éstas, los padres de crianza conozcan mejor al

menor que sus propios padres biológicos. Restringir la intervención judicial de estos custodios en casos como el de autos, como lo decreta la mayoría aquí, es un grave error, **muy detrimental para el menor**. Estos custodios, que con afecto y esmero han estado velando por el bienestar del menor durante varios años, son los verdaderos padres de éste. Ciertamente tienen algo importante que decir y demostrar en el proceso judicial sobre la custodia futura del menor. Resolver lo contrario significa, en términos prácticos, dar al traste e ignorar toda nuestra extensa jurisprudencia sobre la obligación del Estado de procurar el máximo bienestar del menor y sobre cómo se cumple con esa obligación mediante el estudio y ponderación de todos los factores pertinentes a la situación del menor.

III

En las ocasiones y situaciones aludidas en el acápite anterior, la restrictiva interpretación que la mayoría le da al Artículo 30(g)(bis) referido priva a los custodios de facto hasta de los derechos de intervención judicial que éstos hubieran tenido, aun si ese Artículo no existiese, al amparo de la Regla 21 de Procedimiento Civil de Puerto Rico, 32 L.P.R.A. Ap. III, R.21. Si la Ley de Protección de Menores no le hubiese otorgado a los custodios de facto aludidos el derecho a comparecer y presentar su posición en los procedimientos judiciales en cuestión, éstos hubiesen podido **intervenir** no obstante en dichos procedimientos, con arreglo al indudable interés que tienen en el asunto objeto del litigio. Ello es así porque en el ordenamiento procesal moderno, se permite la intervención de personas interesadas, **con la mayor liberalidad**, a los fines de resolver el asunto en litigio de la forma más completa y adecuada posible. R. Mix Concrete v. R. Arellano v. Co., 110 D.P.R. 869 (1981). Sólo se requiere que el que solicita la intervención demuestre "algún interés" en el asunto objeto del litigio. Chase Manhattan Bank v. Nesglo, Inc., 111 D.P.R. 767, 770 (1981). Y, claro

está, no puede negarse racionalmente que una persona que ha estado cuidando a un menor por un espacio de tiempo prolongado, y quien ha desarrollado con éste hondos vínculos de afecto y solidaridad, tiene "algún interés" en la determinación de su custodia futura o de su adopción. Resulta entonces que una medida como el Artículo 30(g)(bis) en cuestión, que se legisló para promover la participación de los custodios de facto en los procedimientos judiciales pertinentes, termina convirtiéndose por <u>fiat</u> de una mayoría de este Tribunal, en una camisa de fuerza para privar a estos custodios incluso de la participación que de otro modo ellos hubiesen tenido de ordinario. Este resultado insólito e incongruente es otra prueba más del error de la mayoría.

IV

Para concluir, es menester reconocer que una razón que ofrece la mayoría para justificar su decisión de truncar el alcance del Artículo 30(g)(bis) de la Ley de Protección de Menores, <u>supra</u>, puede tener algún mérito. Ciertamente no debe estimularse que las salas de nuestros tribunales se conviertan en "cuadriláteros de pelea entre los padres biológicos y los custodios de facto". Mas precisamente, no debe permitírsele a los custodios usar el foro judicial para interponerse **injustificadamente** con los amplios y legítimos derechos que tienen los padres biológicos respecto a sus hijos.

El problema con la postura de la mayoría es que prohíbe la participación adecuada de los custodios de facto **en cualquier caso**, independientemente de si existen o no razones legítimas para permitirles tal participación. El dictamen mayoritario es tan en extremo restrictivo que limita la intervención de los custodios de facto no sólo cuando éstos conocen al menor mejor que sus propios padres biológicos, sino incluso en casos en los cuales los custodios no estén tratando de impedir que los padres biológicos recobren la custodia o patria potestad sobre el menor sino sólo que ello ocurra, digamos, cautelosamente.

En mi opinión, la solución justa al asunto de autos la hemos formulado ya antes, al discernir el criterio a utilizarse para determinar si se debe permitir la intervención de una persona en un pleito al amparo de la Regla 21 de Procedimiento Civil. Hemos resuelto que ese criterio **es de orden pragmático**, no conceptual. No se determina de antemano si la intervención se permite o no. Se decide, más bien, caso a caso, como cuestión práctica, a la luz de los hechos concretos del caso. El análisis puede variar de pleito a pleito. Así no se permite la intervención indiscriminada, ni se excluye a priori la de una persona que tiene un interés real que amerite protección. Chase Manhattan Bank v. Neglo, supra; R. Mix Concrete v. R. Arellano & Co., supra. Tal es la norma que, por analogía, ha debido adoptar la mayoría respecto al asunto que aquí nos concierne: que se determine el grado de participación judicial de los custodios de facto en los procedimientos en cuestión conforme a las realidades particulares de éstos en relación al objeto del litigio. Así pues, en situaciones en las cuales dichos custodios no han tenido contactos significativos con el menor, su participación sería limitada. Pero en aquellos en que éstos han tenido más y mejores relaciones con el menor que sus propios padres biológicos, ciertamente se les permitiría una plena participación en los procedimientos.

Como la mayoría resuelve de otro modo, que considero muy desacertado, DISIENTO.


                                                        JAIME B. FUSTER BERLINGERI
                                                        JUEZ ASOCIADO